GUARANTEE COMPANY OF NORTH AMERICA *v.*
MECHANICS' SAVINGS BANK AND TRUST COM-
PANY.

### CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 48.   Argued April 23, 24, 1901.—Decided January 6, 1902.

Where a bond insuring a bank against such pecuniary loss as it might sus-
tain by reason of the fraudulent acts of its teller, contained a provision
that the company would notify the insuring company on "becoming
aware" of the teller "being engaged in speculation or gambling," it is
the duty of the bank to give such notice, when informed that the teller
is speculating, although, while confessing the fact of speculating, he as-
serts that he has ceased to do so.

When the teller is in fact engaged in speculation and the bank is so in-
formed, it cannot recover on such a bond for losses occurring through
his fraudulent acts after the information is received, when it has not no-
tified the company of what it has heard, or made any investigation, but
has accepted the teller's assurance of present innocence as sufficient, on
the mere ground that it had confidence in his integrity.

When at the time the teller's bond was renewed, the books of the bank
showed that he was a defaulter in the sum of $19,600 understated liabili-
ties, and of $3765.44 abstracted from bills receivable, both of which
could have been detected by the taking of a trial balance or a mere com-
parison between the books kept by him and the individual ledger kept
by another person, and by a correct footing of the notes, the bank is
open to the charge of laches, and a certificate that the accounts of the
teller had been examined and verified is not truthful.

Where it is known to the president of the bank that the insuring company
regards engagement in speculation as unfavorable to an employé's hab-
its, and he is informed that the employé is speculating, a representation
by the president that he has not known or heard anything unfavorable to
the employé's habits, past or present, or of any matters concerning him,
about which the president deems it advisable for the company to make
inquiry, is a misrepresentation.


THIS was a bill in equity brought by the Mechanics' Savings
Bank and Trust Company for the use of J. J. Pryor, assignee,
against the Guarantee Company of North America, for an ac-
counting and for a decree for the amount alleged to be due

complainant on two bonds executed by the Guarantee Company to the bank; one insuring the latter corporation against such pecuniary loss as it might sustain by reason of the fraudulent acts of John Schardt, as teller and collector; and the other insuring the same corporation against pecuniary loss by reason of fraudulent acts committed by him in his office of cashier. On hearing a decree was rendered against the Guarantee Company on both bonds, 68 Fed. Rep. 459, which was affirmed on appeal. 47 U. S. App. 91. The case was then brought to this court by certiorari, and the decree of the Circuit Court of Appeals was reversed and the cause remanded on the ground that the decree of the Circuit Court was not final. 173 U. S. 587.

The Guarantee Company subsequently made an unsuccessful attempt to have the cause reopened for additional evidence alleged to have been discovered since the first decree. A final decree was rendered against the company, which, on appeal to the Circuit Court of Appeals for the Sixth Circuit, was modified and affirmed, 100 Fed. Rep. 559, and the present certiorari was then allowed.

The Mechanics' Savings Bank and Trust Company was a banking institution located at Nashville, Tennessee, with a capital of fifty thousand dollars. John Schardt was its teller from 1888 to January, 1893, when he was elected cashier and remained such until his death on April 17 following. As teller and cashier he embezzled more than one hundred thousand dollars of the funds of the bank, beginning in 1890 and continuing until about the time of his death. In discovering the defalcation the bank ascertained its insolvency, closed its doors, and made a general assignment for the benefit of its creditors.

The Guarantee Company of North America was a company organized under the laws of the Dominion of Canada, and engaged in the business of guaranteeing pecuniary losses by the fraudulent acts of persons in positions of trust, and issued to the bank in 1888 a bond for the period of one year on Schardt as teller for ten thousand dollars, which was subsequently re-

newed each year until January, 1893, when it issued a bond on Schardt as cashier for twenty thousand dollars.

The defalcation of more than one hundred thousand dollars was occasioned by losses in speculation, and just prior to Schardt's death he assigned to the bank some property of slight value, and about eighty thousand dollars of life insurance as indemnity. From these collaterals the bank realized the sum of $46,448.86, and for the remainder of the default the company was held liable to the extent of each bond. On the second appeal to the Circuit Court of Appeals, that court found the default under the cashier's bond to have been some six thousand dollars less than as ascertained by the Circuit Court, and modified the decree accordingly.

The teller's bond was dated January 16, 1888, and described Schardt as the employé and the bank as the employer. It provided :

" Whereas, the employé has been appointed in the service of the said employer, and has been assigned to the office or position of teller and collector, by the said employer, and application has been made to the Guarantee Company of North America for the grant by them of this bond ;

" And whereas, the employer has delivered to the company a certain statement, and it being agreed and understood that such statement constitutes an essential part of the contract hereinafter expressed :

" Now, therefore, in consideration of the sum of one hundred dollars lawful money of the United States of America, to the said company, as a premium for the term of twelve months, ending on the sixteenth day of January, 1889, at twelve o'clock, noon, and in order to effect a continuance of the currency of this bond, a like premium hereafter to be paid to the said company, on or before the sixteenth day of January in each year, as a premium for the ensuing year, so long as the said employer may wish to continue this bond, and the said company shall consent to receive said premiums, it is hereby agreed that the company shall, within three months after proof satisfactory to the directors, make good and reimburse to the employer such pecuniary loss as the employer shall have sustained by the fraudulent acts

of the employé, in connection with the duties of his said office or position, or with any other duties assigned to him, by the employer in the said service, committed by him, and discovered during the continuance of the currency of this bond, and within six months from the employé's ceasing to be in the said service.

"The following provisions are also to be observed and binding as a part of this bond :

"The actual payment of the premium and its acceptance by this company either for the issue or renewal of this bond, is essential to its currency, and a condition precedent, to the right or claim hereunder.

"That this bond is issued and renewed on the express understanding that the employé has not within the knowledge of the said employer at any former period, either in this or other employment, been guilty of any default or serious dereliction of duty.

"That the employer shall observe or cause to be observed all due and customary supervision over the said employé for the prevention of default, and if the employer shall at any time, during the currency of this bond, condone any act or default, on the part of the employé, which would give the employer the right to claim hereunder, and shall continue the employé in his service, without notification to the company, the said company will not be responsible hereunto for any default which may occur subsequent to said act or default of said employé, so condoned.

"That the employer shall at once notify the company on his becoming aware of the said employé being engaged in speculation or gambling, or indulging in any disreputable or unlawful habits or pursuits.

"That there shall be an inspection or audit of the accounts or books of the employé on behalf of the employer at least once in every twelve months from the date of this bond.

"That the company shall be notified in writing of any act on the part of said employé, which may involve a loss for which the company is responsible hereunder to the employer, immediately or without unreasonable delay, after the occurrence of such act shall have come to the knowledge of the employer; and

upon the making of such a claim, this bond shall wholly cease and determine as regards any liability, for any act of the employé committed subsequent to the making of such claim, and shall be surrendered to the company on the payment of all claims due hereunder.

\*        \*        \*        \*        \*        \*

"That the company may cancel this bond at any time, by notifying the employer and refunding the premium paid less a *pro rata* part thereof for the time said bond shall have been in force; but said cancellation shall not affect or impair the company's liability hereunder for any acts committed or discovered previous to such cancellation during the currency of this bond, and within three months after said cancellation."

\*        \*        \*        \*        \*        \*

The statement referred to was signed by the then cashier and delivered to the company before the bond was issued. It commenced with a communication from the managing director of the Guarantee Company, desiring answers to certain accompanying questions. These answers were given by the cashier, who also declared his answers and representations to be true, and that he was "not aware of any matter or thing affecting the character or reputation of the applicant, which should create any doubt as to his reliability or trustworthiness." This bond was renewed each year up to January, 1893, and in each year before the bond was renewed, the company furnished the bank with a blank form, to be filled out, and stating: "It is necessary before the bond can be renewed that you obtain the certificate on the back hereof by your president or cashier and on its return with remittance of the premium, the renewal can be immediately effected."

The certificate on the back was filled up and signed by the cashier, and among other things stated that the accounts of said teller Schardt had been examined and verified by the finance committee of said bank; and the bond was not renewed in any year until this certificate had been made out and delivered to the company.

Before the cashier's bond was issued the company "submitted for reply on behalf of the bank," certain questions, addressed to

the president, which, and the answers thereto by the president as such, are referred to in the bond as "employers' guarantee proposal No. 154,806." Among these questions and answers were the following:

"Q. 2. If a new employé, by whom was the applicant introduced, or how did he become known to you? If hitherto in continuous service, for how long, in what capacities, and has he uniformly performed his duties faithfully and satisfactorily? A. Applicant began service in this bank six years ago as collector —— cl'k, and has since been advanced to bank's teller and now cashier.

"Q. 3. Has he ever been in arrears or default in the bank's service, or, as far as you have heard, in any previous employment? A. No.

"Q. 4. Have you known or heard anything unfavorable as to his habits or associations, past or present? A. No.

"Q. —. Or of any matters concerning him about which you deem it advisable for the company to make inquiry? A. No.

"Q. 5. Is he to your knowledge pecuniarily embarrassed or insolvent? Or is he in any way indebted to the bank? ——

"Q. 6. Is he now or about to be engaged in any other business or employment than in the bank's services? A. No.

"Q. 7. Applicant's position or capacity for which this bond is required? A. Cashier.

"Q. 8. Amount of his salary or other emoluments, if any? A. $2000 per annum.

"Q. 9. Amount or bond hereby required, from what date to commence, and by whom premium will be paid? A. $20,000 to date from Jan. 1, 1893. Premium payable by bank.

"Q. 10. What further security, if any, will be held or required from applicant? A. None.

"Q. 11. Have you hitherto held other security from applicant? If so, why discontinued or changed to this? A. Formerly teller and general bookkeeper in this bank; elected cashier at annual meeting January 1, 1893.

"Q. 12. Has there been any fault in the bank by any employé in applicant's position? A. No.

"Q. 13. When were applicant's books and accounts (includ-

ing cash, securities and vouchers, if any) last examined, and by whom? A. December 31, 1892, by finance committee (were they found correct) of bank and found correct.

"Q. 14. In case of applicant handling cash or securities, how often will the same be examined and compared with the books, accounts and vouchers, and by whom? A. Not less than quarterly, and often monthly, by finance committee.

"Q. 15. In case of applicant acting as teller: (*a*) Will he be required to balance his cash daily, and report same to president or cashier? (*b*) And will a record of same be kept? A. . . . .

"Q. 16. Will applicant handle funds or securities not subject to a routine check, or periodical examination? If so, please describe their nature? A. No."

"The above answers and representations are true to the best of my knowledge and belief."

The cashier's bond was then executed and delivered to the bank, and provided:

"Whereas the said employé has been appointed cashier at Nashville, Tennessee, in the service of the said employer and has been required to furnish security that he shall not be guilty of any fraudulent act in the performance of his duties in the said capacity, by which the said employer shall suffer pecuniary loss, and whereas the said company, in consideration of the sum of one hundred dollars, now therefor paid for the term expiring January 1, 1894, and for the purposes of the renewal of this contract the sum or premiums of one hundred dollars, hereafter to be therefor paid to the said company, on or before the first day of January, 1894, and a like payment for each and every succeeding term of one year, so long as the said company shall consent to receive it—hath agreed upon the terms, and subject to the provisos and conditions hereinafter contained and endorsed thereon, hereby to become such security to the said employer:

"Now, therefore, this bond witnesseth, that the said employé for and on his own behalf and the said company fully relying on the truth of the statement and declaration contained in a certain document distinguished as employer's guarantee proposal No. 154,806, dated the 10th day of Jan., 1893, and signed Lewis T. Baxter, president on behalf of the said employer, and

lodged with the said company at its office in Montreal, and on the strict performance and observance hereafter, by the said employer of the contract thereby created, do hereby, respectively, severally and jointly covenant with the said employer to reimburse unto the said employer or his or their representatives or assigns, the amount of any loss not exceeding in the whole sum of twenty thousand dollars, which, during the currency of this bond, shall be sustained by the said employer by reason of any act of fraud committed by the said employé in connection with the duties of said appointment and constituting embezzlement or larceny—such reimbursement to be made within three calendar months next after proof shall have been given to the satisfaction of the directors of the said company, of the occurrence of such loss, and the proof thereof to include, if the company shall so require, an affidavit to be made or taken by the person, for the time being entitled to the benefit of this guarantee, to the effect that he hath been actually defrauded by the said employé, and that he suffers absolute and ultimate loss thereby to the full amount claimed hereunder, and that the contract created as aforesaid hath been fully performed and observed on the part of the said employer.

" Provided always," that this bond and guarantee hereby granted or undertaken, shall be subject and liable to the terms and conditions hereupon endorsed."

Among the terms and conditions referred to were these :

" This bond is granted upon the following express conditions :'

" 1. Any misstatement of a material fact, in the declaration within mentioned, or in any claim made under this bond, will render this bond void from the beginning.

" 2. That the said employer shall use all due and customary diligence in the supervision of said employé for the prevention of default, and to that end shall cause an inspection or audit of his accounts to be made at least-once within twelve months, and if the said employer shall at any time during the currency of this bond, become aware of any act or default on the part of said employé which would constitute a claim hereunder, and shall continue said employé in his service without notification to the said company, the said company will not be responsible

hereunder for any loss or default which may occur subsequent to said act or default of said employé.

"3. That any written answers or statements made by or on behalf of said employer in regard to or in connection with the conduct, duties, accounts or methods of supervision of the said employé delivered to the company either prior to the issue of this bond, or to any renewal thereof, or at any time during its currency, shall be held to be a warranty thereof, and form a basis of this guarantee, or of its continuance.

"4. That the said employé has not, to the knowledge or belief of said employer, been guilty of any serious dereliction of duty, or default in this or any other service, or that his habits have been such as to incur said employer's censure, previous to the issue of this bond.

"5. The said employer shall, immediately, upon it becoming known to him or them, that the said employé has been guilty of any act entitling the said employer to claim under this bond, notify the said company, at its head office; and this bond shall become absolutely void, both as to existing and future liability if the said employer shall neglect or omit to so notify the said company.

*          *          *          *          *          *

"8. That in addition to the supervision to be exercised by the said employer as mentioned in the statement and declaration within referred to the said company shall be afforded every reasonable facility to examine from time to time as they may desire, for the purposes of this bond, the books, papers and affairs of the said employer entrusted to the keeping and charge of the said employé."

It appeared from the evidence that Schardt defaulted as teller and collector from September 12, 1890, to January 1, 1893, in the sum of $78,819.24, subdivided as follows: From September 1, 1890, to January 16, 1891, $5879.34; from January 16, 1891, to January 1, 1892, $22,290; from January 1, 1892, to January, 1893, $50,649.90; and as cashier, from January 16, 1893, to April 15, $22,964.17.

The principal books of the bank were: A general ledger, showing generally the accounts of the bank, including the ac-

count in totals of the deposits made and checked out daily; a cash book, giving each day's business; a daily balance book, which was a summary of the general ledger; these three books were kept by Schardt; and an individual ledger, which showed in detail the deposit account of each individual depositor, and was kept by a clerk, who had no other duties, and was known as individual bookkeeper. The aggregate of the amounts due each depositor shown on the individual ledger and the totals due depositors on the general ledger and daily balance book should have agreed, but this they did not do because, after the latter part of 1890, the general ledger and daily balance book did not correctly show the amount due to all depositors, although the individual ledger correctly gave the amount due to each depositor. Up to the latter part of 1890 trial balances were taken from the individual ledger every two weeks, or once a month, and entered in a trial balance book, and these balances were compared with the balances on the general ledger and any differences settled and corrected, but at that time Schardt told the individual bookkeeper that it was not necessary to take off trial balances any longer, and thereafter none were taken off. Schardt, as teller, abstracted the funds of the bank and understated on the general ledger the amount due to depositors by the amount he abstracted. The difference in the balances represented the shortage at the respective dates. The individual and general ledger were out of balance January 16, 1891, $2098; January 1, 1892, $19,600, and January 1, 1893, $69,700.

The leading expert accountant testified that he was employed to examine the books on April 15, 1893, and went to the bank on the morning of that day between eight and eight thirty o'clock, and that by four o'clock that afternoon he had discovered that while the daily balance book kept by Schardt showed less than $18,000 due depositors, the individual ledger from "A" to "L," (leaving "M" to "Z" to be examined) showed an indebtedness due depositors of in the neighborhood of $55,000. He reported at once that something was radically wrong; although it required considerable time subsequently to ascertain the exact condition of the bank.

Quarterly examinations of the bank's condition were made

by the finance committee, but the individual bookkeeper was not requested to furnish the total amount shown on the individual ledger to be due depositors. The committee "examined no book except the daily balance sheet, with which we compared the reports as made out by Schardt." "Q. In what way could you tell that the amounts reported by Schardt were correct? A. We only had his word for it and the reports that he made to us and the exhibit on the daily balance book." "Q. In what way did you verify the statement on the book kept by Schardt which would have shown and purported to show the amount due individual depositors? A. We made no verification of it only in the manner in which I have stated. Q. Have you stated any manner in which you verified this particular account? A. We took his word for it, which we had to do or go into an examination of all the books."

Schardt also abstracted proceeds of notes paid to him as teller. This shortage was not concealed on the books. The amount of notes in the bank did not equal the amount called for by the books by the amount abstracted.

January 1, 1892, the books showed a defalcation of $28,169.34, of which $19,600 was abstracted deposits and $3765.44 proceeds of notes collected and not accounted for. January 1, 1893, the books showed a defalcation of $78,819.24, of which $69,700 was abstracted deposits and $4015.44 proceeds of notes collected.

The following evidence was also introduced:

Charles Sykes, who was the cashier of the bank from January, 1890, to January, 1893, testified:

"Q. 6. Did you at any time during that year receive information that John Schardt was speculating; if so, state when, how and all the circumstances? A. Yes, sir; I did receive such information. Some time in the summer or fall of 1892 a gentleman by the name of Kyle came here from New York, representing Myers & Co., of New York. Kyle wanted me to become interested in the brokerage business and represent Myers & Co. at this point. I told him that I did not like the idea because it would be purely a speculative business, and he

then said that that made no difference; that John Schardt, our teller, was a part owner in a similar concern.

"Q. 7. Did you impart this knowledge to any one; if so, whom? A. Yes, sir; I once told Mr. L. T. Baxter, the president of the bank, of the conversation.

"Q. 8. Did you say anything to Schardt about the matter? A. Yes, sir; on the next day, I think I told Mr. Schardt of of what Kyle had said.

"Q. 9. What did Schardt say to you in reply? A. He admitted that he had at one time been interested in such a concern, but had sold his interest; and that he had speculated to some extent, but had made money on every transaction, and had seen the error of his way, and had ceased to do so any more.

"Q. 10. Did you impart this information received from Schardt to any one connected with the bank, if so, whom? A. Yes, sir; I immediately told Mr. Baxter, the president of the bank, what Schardt had said.

"Q. 11. Did you receive any other information at any other time with reference to Schardt's speculating? A. Yes, sir; some time thereafter I received an anonymous letter telling me that Schardt had been speculating.

"Q. 12. What did you do with it and what became of it? A. I showed it to Mr. L. T. Baxter, the president, and he said not to pay any attention to an anonymous letter, and I spoke to Schardt about it, and he said he thought he knew the author, and asked me to let him have the letter, and he would bring the party before me and make him acknowledge it was false.

"Q. 13. Did you give him the letter and did he bring the party before you? A. I gave him the letter, and asked him about it more than once, and he always replied that he was working on it.

"Q. 14. Did you tell Mr. Baxter of this conversation? A. I think I did."

On cross examination the witness said there was litigation pending between him and the bank's assignee; that he signed several applications for the renewal of Schardt's bond as teller,

relying on the fact that the finance committee said his accounts were correct; that he did not remember that he recommended Schardt as his successor to Porter or Duncan, though he might have, and if Mr. Porter said that he did, he supposed he did. Mr. Porter testified that he asked Sykes about Schardt's ability; "there was no question as to his integrity."

J. M. Eatherly testified that he had been a director of the bank from its organization until its assignment; a member of the finance committee for several years prior to being elected president, and president from March 28 to April 17, 1893.

In answer to questions from complainant's counsel in respect of an interview with Schardt on the evening of April 15, 1893, he said:

"I told him that we had come out for the purpose of getting an explanation as to the discrepancies mentioned above. I told him we had found errors in his books. He said, 'Mr. Eatherly, my books are correct.' I told him that I did not see how he could reconcile the two things that we had found the daily balance sheet showing something less than $18,000 due depositors, while the individual ledger, as far as had been examined by Mr. McEwan and Mr. Richardson, showed about $55,000 due depositors. He reiterated that his books were absolutely correct. I said, 'John, I cannot understand it that way.' I was satisfied there was an error somewhere. I asked Mr. Richardson if he wanted to ask him any question. He was silent a moment or two, and said, 'I don't know that I do.' He then turned to Mr. Schardt, and said: 'John, I am bound to say to you that you are a defaulter.' Mr. Schardt broke out into a cry, putting his hands over his face, and said: 'My God! it is true—too true.' I said: 'John, compose yourself; we have come here for facts and want facts.' I then asked him how much was his default and he said about $40,000. I told him if the other individual ledger showed the same proportion of discrepancy that this one did, that he was a defaulter to a much larger amount—I would say to not less than $60,000 or $70,000. He said, 'Mr. Eatherly, you are mistaken. It cannot be that much.' I then asked him how he had lost it, and he said, 'Speculating in New York, and you can get it all back.' He said,

' you' meaning the bank.   I said, ' No, John, we can do no such thing; the laws of New York legalize this sort of trading, and we cannot recover it in that way.'"

On cross examination he testified:

" Q. 98. Did you ever hear of Schardt's speculating before January, 1893?   A. I think I did.

" Q. 99. Did you see the anonymous letter written with respect to his speculating?   A. I saw a letter directed to Judge John Woodward.   Judge Woodward brought that letter to the bank and showed it to me, and I asked permission to call Mr. Schardt up and show it to him, and he said that he was perfectly willing that I should do so.   I at once called Mr. Schardt to where we were and told him there was a communication I wanted him to read.   He did so, and his remarks were: ' It is a lie and I can prove it.'   In this letter it was stated that Mr. Schardt was a partner in a bucket shop.   I told Mr. Schardt that it devolved on him to prove it false.   I at once reported the contents of this letter to the president of the bank, Mr. Baxter.   Mr. Schardt asked that I and Judge Woodward remain there for a few minutes.   He went out and got Frank Searight and Dr. Barry.   Judge Woodward, Mr. Baxter and myself went into the rear of the bank building.   Mr. Schardt and the other gentlemen came back, and Mr. Schardt says: ' Here are men who can tell you whether that is so or not.'   I asked them if they knew why we had sent for them, and they said that Mr. Schardt had told them.   Mr. Searight said some time before that Mr. Schardt, Dr. Barry and himself had agreed to open a brokerage association.   They objected very much to the term bucket shop.   Each one was to put in a small amount— $200, I think.   Mr. Schardt, in a short time, became dissatisfied and sold his interest to Frank Searight at a small loss.   Subsequent to that I went to Mr. Schardt's house to see him, having heard again that he was speculating.   I told him what I had heard and he said it was not so, that he did not own any stocks at all.   I told him if he was he ought to quit that or quit the bank, and he said he had sold everything he had.   I again heard that he was speculating, but from sources that I did not attach any importance to, as it all emanated from the same source as

the anonymous letter. I again approached him and he denied it.

"Q. 100. Was this just prior to the resignation of Judge Woodward as a member of the board? A. I think it was.

"Q. 101. Do you know when he resigned? A. His resignation bears date Feb. 17, 1893. Was placed before the board of directors and accepted March 25, 1893.'

"Q. 102. Did Mr. Baxter, the president, ever say anything to you about Schardt speculating? A. I don't think he ever did."

The general agent of the company at Nashville testified that Schardt's bond as cashier was cancelled through him on April 15, he having ascertained that Schardt had been speculating in futures; that he had not heard of any defalcation or wrongdoing on the part of any employé of the bank other than this; and that the company did not bond persons holding a fiduciary position, who speculated in futures, as they had found from experience that the risk was not safe.

There was evidence that Schardt had borne a good reputation for honesty, integrity and industry; and of experts that, without trial balances from the individual ledger, the true condition of the bank could not be known; and that to verify accounts meant to apply some other test than the statements of those who kept them.

*Mr. William L. Granbery* for petitioner.

*Mr. Edward H. East* for respondent.

MR. CHIEF JUSTICE FULLER, after stating the case as above, delivered the opinion of the court.

The teller's bond, as originally given, expired January, 1889, and was renewed from year to year. Before each renewal, the bank was informed by the company that it was necessary that a certain certificate by the president or cashier should be furnished, which was done, and stated, among other things, that the accounts of the teller had been examined and verified by the finance committee of the bank. The bond provided that it

was issued and renewed " on the express understanding that the employé has not within the knowledge of the said employer at any former period either in this or other employment been guilty of any default or serious dereliction of duty ; " " that the employer shall observe, or cause to be observed, all due and customary supervision over the said employé for the prevention of default ; " and that there shall be " an inspection or audit of the accounts or books of the employé on behalf of the employer at least once in every twelve months from the date of this bond."

The company, not unnaturally, contends that as when the bond was renewed in January, 1892, the bank's books showed that the employé was a defaulter in the sum of $19,600 understated liabilities, and of $3765.44 abstracted from bills receivable, both of which could have been detected by the taking of a trial balance as is customary, or a mere comparison between the books kept by Schardt and the individual ledger, and a correct footing of the notes, the bank had not only not complied with its engagements above referred to, and falsely certified to a verification which in fact had not been had, but was guilty of such laches as in itself to defeat a recovery.

These are matters which, while not controlling our decision, should be considered in connection with that aspect of the case which we regard as decisive.

In addition to the provisions already mentioned, it was agreed " that the employer shall at once notify the company, on his becoming aware of the said employé being engaged in speculation or gambling, or indulging in any disreputable or unlawful habits or pursuits."

The legislation of Tennessee and the decisions of its courts placed dealing in futures, when either party did not contemplate delivery, in the category of gambling, and aimed to suppress it. *Allen* v. *Dunham,* 92 Tenn. 257 ; *McGrew* v. *City Produce Exchange,* 85 Tenn. 572 ; *Palmer* v. *State,* 88 Tenn. 553 ; act of March 30, 1883, Acts 1883, c. 251, 331.

The evidence showed that in the summer or fall of 1892 the cashier of the bank was told that the teller was part owner in a concern engaged in speculative business ; he at once informed

the president of the bank; and also called Schardt's attention to the matter, who admitted that he had once been engaged in such a concern, but said he had sold out, and also that he had speculated to some extent, but had ceased to do so. The cashier further testified that he afterwards received an anonymous letter that Schardt was speculating, and showed it to the president; that he spoke to Schardt about it; that the latter said he thought he knew the author, and asked for the letter, that he might bring the party before the cashier and make him acknowledge that it was false. The letter was given him but nothing came of it, although he was asked about it more than once. This conversation was reported to the president. A leading director and a member of the finance committee was shown by another director an anonymous letter to him, to the same effect, which was reported to the president. The letter stated that Schardt was in partnership in a bucket shop. Schardt said it was a lie, and brought his partners before the president and the two directors, and they said that they had opened a brokerage association with Schardt, but that Schardt had sold out. This director subsequently heard again that Schardt was speculating and went to Schardt's house and interviewed him, and he said he did not own any stocks at all, he had sold everything he had. He heard this again shortly after the cashier's bond was given, and Schardt again denied it. Complainant did not put the president of the bank on the stand.

In these circumstances was it the duty of the bank to notify the company of what it had heard?

In *American Surety Company* v. *Pauly*, 170 U. S. 133, 144, which was an action against the maker of a bond given to insure a bank against loss arising from acts of fraud or dishonesty on the part of its cashier, the applicable rule was thus laid down:

"If, looking at all its provisions, the bond is fairly and reasonably susceptible of two constructions, one favorable to the bank and the other favorable to the surety company, the former, if consistent with the objects for which the bond was given, must be adopted, and this for the reason that the instrument which the court is invited to interpret was drawn by the attor-

neys, officers or agents of the surety company. This is a well established rule in the law of insurance. . . . As said by Lord St. Leonards in *Anderson v. Fitzgerald*, 4 H. L. Cas. * 484, * 507, 'it [a life policy] is of course prepared by the company, and if therefore there should be any ambiguity in it, must be taken, according to law, most strongly against the person who prepared it.' There is no sound reason why this rule should not be applied in the present case. The object of the bond in suit was to indemnify or insure the bank against loss arising from any act of fraud or dishonesty on the part of O'Brien in connection with his duties as cashier, or with the duties to which in the employer's service he might be subsequently appointed. That object should not be defeated by any narrow interpretation of its provisions, nor by adopting a construction favorable to the company if there be another construction equally admissible under the terms of the instrument executed for the protection of the bank."

But this rule cannot be availed of to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties, and embodying requirements compliance with which is made the condition to liability thereon.

Whatever the common law duty on the part of the employer to notify the guarantor of the fraud or dishonesty of the employé, whose fidelity is guaranteed, the parties to this contract undertook to declare the duty of the bank to the company in certain specified particulars. It required that the employé should not have been guilty of previous default or dereliction *within the knowledge* of the employer. It provided for notification of any act of the employé which might involve a loss without unreasonable delay after the occurrence of the act came *to the knowledge* of the employer. And it required immediate notification on the employer *becoming aware* of the employé being engaged in speculation or gambling. The words, " becoming aware," were manifestly used as expressive of a different meaning from having " knowledge."

In *Pauly's* case, where the bond required that the company should be notified in writing " of any act on the part of the employé, which may involve a loss for which the company is

responsible hereunder, as soon as practicable after the occurrence of such act may have come to the knowledge of the employer," it was ruled that it had been properly held "that the surety company did not intend to require written notice of any act upon the part of the cashier that might involve loss, unless the bank had knowledge, not simply suspicion, of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty."

But the bond before us not only contained that clause but the clause under consideration, which was a different and additional clause intended to secure the safety of prevention through timely warning.

It seems to us that the obvious meaning of "becoming aware," as used in this bond, is "to be informed of," or, "to be apprised of," or, "to be put on one's guard in respect to," and that no other meaning is equally admissible under the terms of the instrument. These are the definitions of the lexicographers, distinctly deducible from the derivation of the word "aware," and that is the sense in which they are here employed. It is used in the same sense in the cashier's certificate on the renewals of the teller's bond.

To be aware is not the same as to have knowledge. The bond itself distinguishes between the two phrases and uses them as not synonymous with each other. And, in view of the plain object of the clause, we cannot regard the words equivalent to "becoming satisfied," though perhaps they may be to "having reason to believe." Even then these facts would have demanded investigation or notification, for we think the bank cannot be heard to say it did not have reason to believe that Schardt was speculating when it took his professions of repentance as sufficient assurance that he had ceased speculating, and turned its back on any independent inquiry or investigation. Our understanding of the provision is that what the company stipulated for was prompt notification of information by the bank in regard to speculation or gambling on the part of the employé. It was entitled to exercise its own judgment on that information and had not agreed to rely on the bank's belief in that regard. It had the right to investigate for itself whether

the bank did so or not.   Notification of the existence of reason for inquiry was exactly what the clause was intended to secure. The bank neither investigated nor gave the company notice of the information it had, and substituted its own judgment as to the value of that information for that of the company.   In our view this conduct on its part amounted to a breach of the stipulation.

The Circuit Judge in his opinion said : " The language of the bond is that the employer shall report ' on his becoming aware of the employé being engaged in speculation.'  Without now stopping to consider at length the meaning of the terms here- used, I am of opinion that, in the absence of fraud or bad faith, the failure to disclose the result of the inquiry made in this instance did not invalidate the bond as to the surety.   Certainly, speculation in a reasonable and substantial sense is meant, such in length of time or magnitude as would make it serious.   This, when brought to the attention of the bank officials, was a past event, and apparently in itself unimportant.   The bank was under no duty by the contract or independently of it to actively institute or prosecute inquiries about Schardt, or to run down loose rumors or anonymous letters."   68 Fed. Rep. 459, 465.

The Circuit Court of Appeals said : " There is not the least evidence of any bad faith on the part of any of these officers of the bank, including Sykes, the old cashier, in not making a disclosure of what was known, but only of bad judgment in not being more considerably affected by their information."   47 U. S. App. 115.

The quotations show that the Circuit Court of Appeals and the Circuit Court concurred in the opinion that if the president and directors had such confidence in Schardt that they did not feel called upon to make any investigation in view of the information that they had received, or to notify the company of that information, and were not guilty of intentional bad faith, then the bank could not be held to have violated the stipulations of the bond on its part.

As will have been seen, we are unable to accept this conclusion.   The company's defence did not rest on the duty of diligence growing out of the relation of the parties, but on the

breach of one of the stipulations entered into between them. The question was not merely whether the conduct of the bank was contrary to the nature of the contract, but whether it was not contrary to its terms. Engagement in speculation or gambling was what the company sought to guard against because experience had admonished it of the probability that speculation or gambling would lead to acts involving loss for which it would be responsible. Bad faith in the view of the courts below would not exist if the bank had such confidence in Schardt's integrity that it accepted his bare statement that he was not speculating as overcoming the weight of his admission that he had been. How anything but such a denial could be expected it is not easy to see, nor how careful and prudent men could have been justified in omitting independent inquiry.

The truth is that in spite of strict supervision and the pursuit of the best systems of keeping accounts, there is always a risk of defalcation. The prevention of defaults or their detection at the earliest possible moment are of even more vital importance to financial institutions than to the guarantors of the fidelity of their employés. The provisions intended to protect the company in this case were not in themselves unreasonable and so far as they operated to compel the bank to exercise due supervision and examination, and due vigilance, were consistent with sound public policy. We think it was the duty of this bank to have made prompt investigation, or at all events to have notified the company at once of the information that it had, and we decline to hold that the bank's misplaced confidence in Schardt affords sufficient ground for enforcing the liability of the surety company on the theory of good faith.

Our conclusion is that the failure of the bank in the particulars adverted to defeats a recovery on the teller's bond for defalcation after information of Schardt being engaged in speculation was received.

It also results that there can be no recovery at all on the cashier's bond. If the bank had observed the stipulation in the teller's bond to which we have referred, it is obvious that

there would have been no cashier's bond, and the question would not have arisen. But this it did not do, and the bond was given. The bond provided that the company covenanted with the bank in reliance on the statement and declaration of the president on behalf of the bank, and on the bank's strict observance of the contract; that any misstatement of a material fact in the declaration should invalidate the bond; that the bank should use "all due and customary diligence in the super-vision of said employé for the prevention of default;" "that any written answers or statements made by or on behalf of said employer in regard to or in connection with the conduct, duties, accounts or methods of supervision of the said employé delivered to the company either prior to the issue of this bond, or to any renewal thereof, or at any time during its currency, shall be held to be a warranty thereof, and form a basis of this guarantee, or of its continuance."

Two of the questions and answers in the declaration were as follows :

"Q. Have you known or heard anything unfavorable as to his habits or associations, past or present? A. No.

"Q. Or of any matters concerning him about which you deem it advisable for the company to make inquiry? A. No."

In *Pauly's Case*, the president and the cashier were confed-erates in the dishonesty of the cashier, for the purpose of de-frauding the bank; and also it was held no part of the duties of the president under the circumstances there disclosed to cer-tify to the integrity of the cashier as he did. In this case the dishonesty was that of the cashier alone ; the statements were required to be and were made on behalf of the bank, and the president acted for the bank in so doing ; and the bonds were procured by the bank, and the bank paid the premiums. There can be no doubt that the bank was responsible for the represen-tations of its cashier in the one instance and its president in the other in procuring these contracts of indemnity. The represen-tations made in the declaration on which the cashier's bond was issued were clearly misrepresentations. The teller's bond required notification if the bank were informed of speculation on Schardt's part. The president had heard of such speculation,

and knew that speculating was something unfavorable as to Schardt's habits ; and the president of course knew that the matters concerning him, of which he had heard, were such as it was advisable for the company to make inquiry about. True, the second question was if he had heard of matters about which he deemed it advisable for the company to inquire and the word "deem" might be said to give a considerable discretion, but it was not a discretion to be abused. That the company would consider it advisable to make inquiry is too plain for argument. The whole tenor of the bond renders any other conclusion impossible.

We cannot regard the representations of the president as consistent with good faith, and he was not even called as a witness by the bank to explain his conduct, if he could have done so.

*The decrees of both courts are reversed, and the cause remanded to the Circuit Court for further proceedings consistent with this opinion.*