## The United States Fidelity & Guaranty Company v. The First National Bank of Dundee.

### Gen. No. 13,411.

1. INSURANCE—*what contract of, as distinguished from undertaking of suretyship.* Held, that the bond of the guaranty company given in this case was a contract of insurance as distinguished from one of suretyship.

2. INSURANCE—*definition of misrepresentation as applied to law of.* A misrepresentation in insurance is defined to be "the statement of something as a fact which is untrue in fact and which the insured states, knowing it to be untrue, with the intent to deceive the insurers; or which he states positively as true without

knowing it to be true and which has a tendency to mislead—such fact in either case being material to the risk and adverse to the insurers."

3. INSURANCE—*effect of misrepresentation.* A misrepresentation, whether intentional or made through mistake and in good faith, avoids the policy.

4. INSURANCE—*by whom question of what material to risk determined.* The parties to a contract of insurance are entitled to determine for themselves what is or is not material to the risk.

5. INSURANCE—*what evidence does not conclusively show failure to examine cashier's books.* The fact that a false entry existed in a cashier's book, and was not discovered, does not conclusively show a failure by the employer to have examined such books.

6. INSURANCE—*difference of construction between contract of, and contract of guaranty.* A surety or guarantor is a favorite of the law and its contract is to be construed most liberally in its favor, but the converse is the case with respect to contracts of insurance.

7. INSURANCE—*what does not relieve casualty company from liability under contract of, made with respect to honesty of employes.* It is no defense to a contract insuring an employer against the dishonesty of an employe to show that the dishonesty of such employe could have been avoided by the exercise of extraordinary and constant vigilance.

8. INSURANCE—*what not new contract of.* Held, that a new contract of insurance was not made by a renewal agreement which provides, among other things, that the company "hereby continues in force," etc.

Bill for injunction. Appeal from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1906. Affirmed. Opinion filed December 6, 1907.

**Statement by the Court.** Appellant filed its bill of complaint seeking to enjoin appellee from prosecuting an action at law then pending in the Circuit Court of Cook county upon a schedule bond for $10,000 issued by appellant, guaranteeing the fidelity of one of appellee's employes, and also from commencing any other action or proceeding against appellant upon said bond or renewals thereof. Appellee answered the bill and filed a cross-bill praying that the amount due appellee under the bond and the renewals thereof be ascertained and a decree entered in its favor for such amount.

The bond in question is known as "an employer's schedule bond." In it the Guaranty Company covenanted and agreed with the bank in respect to those of the bank's employes "whose name or names appear in the schedule hereto attached, which is hereby referred to and made a part of this bond in respect to whom the employer requires indemnity of the kind and nature hereinafter provided, * * * that it will, at the expiration of three months after proofs of loss shall have been furnished to the company pay to the employer the amount of any loss or damage that shall happen to the employer in respect of any funds, property or estate belonging to or in the custody of the employer, through the dishonesty of any of the employes or through any act of omission or commission of any of the employes done or omitted in bad faith and not through mere negligence, incompetency or any error of judgment, and whether such dishonesty or such act of omission or commission occurs in the performance of any duty or trust specially assigned to such employe or occurs otherwise." The liability under the terms of the original bond began on or after the twenty-fifth of January, 1901, and terminated one year thereafter, unless renewed. It is provided in the bond, among other things, that in case the employer be a corporation "the knowledge of its board of directors or trustees or of any executive officers, such as president, vice-president, cashier or assistant cashier of a bank" shall be deemed the knowledge of the employer "unless such officer be in collusion with the employe through whom the loss occurs." The bond was subject to renewal from year to year by agreement. The schedule attached to the bond contained the name of the cashier of the bank, one Francis B. Wright, on account of whose defalcation the bank is seeking to recover on the bond.

When the term of the original bond was about to expire at the end of the first year, the Guaranty Company notified the bank, requesting it to fill in, sign and for-

ward a form of certificate which accompanied the letter, and stating that thereupon "a renewal receipt will be sent to you and remittance for premium can then be made." The certificate which was so signed and forwarded by the bank is as follows:

"To the United States Fidelity and Guaranty Company:

This is to certify that the books and accounts of the persons in our employ, as per schedule attached, were examined by us from time to time in the regular course of business and we found them correct in every respect, all monies handled by them being accounted for. They have performed their duties in an acceptable and satisfactory manner, and we know of no reason why the guarantee bond should not be continued. Signature: First National Bank, Delos Dunton, Pres., Employer. Dated at Dundee, Ill., Jan'y 22, 1902."

A renewal receipt or agreement was thereupon executed by the Guaranty Company and forwarded to the bank, continuing the bond in force from January 25, 1902, to January 25, 1903. When at the end of the second year the bond so renewed was about to expire, the bank was again notified, again executed a certificate in the same form as before and again received a renewal agreement continuing the bond in force until January 25, 1904, "subject to all the covenants and conditions set forth and expressed in said schedule bond heretofore issued on the 25th day of January, 1901."

It appears from the evidence and is not disputed that the cashier, Wright, named in the schedule of the bond, embezzled the sum of $3,000 belonging to the bank during the first year while the original bond was in force. During the second year the sum embezzled was $24,513.75, and the third year up to the time of discovery the sums misappropriated aggregated $36,050, making, according to these figures, a total during the three years of at least $63,563. The discovery was made in November, 1903, and in

August, 1904, the bank brought suit against the Guaranty Company, seeking to recover so much of the defalcation as was covered by the bond, the penalty of which was $10,000. In April, 1905, while that suit was pending, the Guaranty Company filed its bill of complaint now under consideration, alleging that its defense to the suit of the bank was not available at law. Appellee answered and filed a cross-bill praying that the amount due it on the bond be ascertained, and for a judgment or decree for such amount.

The Guaranty Company offers to pay for so much of the defalcation as occurred during the first year, while the original bond was in force, but it seeks to avoid liability for losses which occurred during the two subsequent years covered by renewals.

The Circuit Court denied appellant the relief sought in the original bill and entered a decree in favor of the bank for $10,000. From that decree this appeal is prosecuted.

JUDAH, WILLARD, WOLF & REICHMANN, for appellant.

NEWMAN, NORTHRUP, LEVINSON & BECKER and CHESTER E. CLEVELAND, for appellee.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is contended in behalf of appellant that the two certificates, which were alike, made by the bank to the appellant to obtain a renewal of the original bond, contained misrepresentations such as should relieve the Fidelity Company from liability. In these certificates, the first of which is shown in the preceding statement, the bank by its president certifies to the company that it has "examined" the books and accounts of the cashier "from time to time in the regular course of business;" that it has found these books and accounts correct in every respect, that the moneys

handled by the employe—the cashier subsequently found to be a defaulter—were accounted for, and that he had performed his duties in an acceptable and satisfactory manner. It is contended that these representations were untrue, that no fair and just "examination" within the meaning and scope of the word as used in the certificate had been made, that the irregularities of the cashier were readily discoverable from the bank's books, and that the fact they were not discovered at that time is evidence tending to show that no such examination was made; that the books of the bank show on their face that a cursory and superficial examination would have disclosed that many thousands of dollars had not been accounted for, when the second of the certificates in question was made to obtain the second renewal of the original bond. The contention is that the renewal or continuation agreements extending the original bond for a second and afterward a third year were based upon, and were agreed to by the guaranty company in reliance upon the truth of the representations contained in the respective certificates in question, and that not being true the guaranty company, appellant herein, is entitled to the relief prayed for in its bill of complaint.

The bond in controversy is no doubt a contract of insurance, as distinguished from a contract of suretyship. It is alleged in the bill of complaint "that said bond was executed and delivered as aforesaid for the purpose of insuring the fidelity of one Francis B. Wright, whose name is mentioned therein." Nevertheless, a misrepresentation of a material fact in reliance upon which a contract of insurance is issued may avoid a policy "if false and material to the risk." May on Insurance, sec. 181. In the work cited a misrepresentation in insurance is defined to be "the statement of something as a fact which is untrue in fact and which the insured states, knowing it to be untrue with the intent to deceive the insurers; or which he states positively as true without knowing it to be true

and which has a tendency to mislead—such fact in either case being material to the risk and adverse to the insurers." It is further said that a misrepresentation, whether intentional or made through mistake and in good faith, avoids the policy. If therefore in the case at bar the bank and its president made misrepresentations as thus defined material to the risk, upon faith in which the contract of insurance and renewals thereof in controversy were entered into, such representations might doubtless avoid the policy. Burlington Mut. Life B. Ass'n v. Cummins, 53 Ill. App. 530-538; Carrollton F. Mfg. Co. v. Am. C. I. Co., 115 Fed. Rep. 77-79. It is reasonable that parties should be allowed to determine conclusively for themselves what representations shall be deemed material to the risk, and when the insurer makes inquiry as in the case at bar, concerning certain matters, prior to making the contract and the insured answers, such matters are to be deemed material, since the "inquiry shows that the insurer considers the fact material and an answer by the insured affords a just inference that he assents to the insurer's view." May on Insurance, sec. 185. In the present case it may be conceded that the bond in controversy was twice renewed, in reliance in each case upon the representations made in the certificate under consideration.

The question of appellant's liability therefore mainly rests upon the truth or falsity of the representations so made. Were they misrepresentations within the meaning of the term as above defined? Appellant insists not only that they were untrue, but that the bank by its president knew them to be untrue when made; that if the cashier's books and accounts had been examined as the certificate says they were, the cashier's defalcation could not have escaped discovery, and that the fact the irregularity was not discovered should be deemed conclusive evidence that no examination within the meaning of the representation had

been made; that if there had been such examination it would have been apparent there were cogent reasons "why the guarantee bond should not be continued." It was held by the Circuit Court that appellant is in no event liable beyond the penalty of $10,000 mentioned in the bond. The cashier's defalcation under the first renewal exceeded that sum, and prior to that renewal he had misappropriated $3,000 while the original bond was in force. The first question for consideration therefore is, whether under the evidence the statements made in the first of the certificates made by the bank and dated January 22, 1902, were misrepresentations, false in substance or in fact. The evidence is not disputed tending to show that when that statement or certificate was made the books and accounts of the cashier contained an entry of only one irregular transaction. Appellant's contention therefore that this first certificate made by the bank to secure the first renewal, in which certificate it is stated the books and accounts of the cashier had been examined from time to time in the regular course of business and found correct, must rest upon the failure to discover this, the first, and up to that time apparently the only defalcation. Can such failure be deemed, as appellant contends, conclusive evidence or even fairly satisfactory evidence tending to show that no such examination as was represented had been made? The bank books show that during that year covered by the certificate in question the bank had made 739 discounts. These were all regularly and correctly entered on the books except one. As to that the discount register showed the cashier had discounted his own note for $300. The cash book, however, showed that the bank had paid out at that time $3,000, by a draft on Chicago, payable to the order of "E. Linn." The date of these entries was June 1, 1901. The discount register shows that this note for $300 was apparently paid April 4, 1902, which was after January 22, 1902, when the certificate in con-

troversy was given by the bank. At that time therefore this discounted note was apparently still outstanding. The method then adopted by the cashier to cover up his transactions was the same he subsequently followed; that is, he would discount his own note for a small amount and draw a draft for ten times its amount. The discount register, which it is said was a memorandum book only and not one of the regular books of account, would in due time show the note to have been paid, and the transaction apparently closed. There was, however, in the cash book an entry corresponding to the number in the register of the note discounted, which showed that the bank had paid out $3,000 in discounting that note. Thus the cash book correctly showed the amount paid out and balanced correctly. The discrepancy could only be discovered by comparing the discount register with the cash book, item by item. If this were done, apparently the defaulting cashier shrewdly calculated the discrepancy indicated only by an additional cypher might escape observation in the usual course of business, and if noticed might readily be explained as due to an inadvertent mistake or omission of a cypher in the discount register. The evidence is not apparently questioned to the effect that at that time the reputation and standing of the cashier in that community were of the best. No breath of suspicion had ever been uttered against him and no suspicion existed. Under these circumstances, it is not strange, we think, that no necessity was supposed to exist for anything more than the ordinary examination of his books and accounts made "from time to time in the regular course of business," which is all the bank certified to having made. Nor does it appear that by such examination this single misappropriation would be likely to be detected. The cash books balanced correctly. The discount register was correct on its face. No suspicion of irregularity existed. If a comparison of each item of the discount register or each note dis-

counted with the amounts shown by the cash book to
have been paid out had been made, all the items would
have been found to correctly correspond except the
one referred to, and that discrepancy, consisting only
of the omission of a cypher, might be overlooked in
such casual examination. There is testimony of an
expert that "as a matter of bookkeeping it is some-
times quite deceiving, particularly for a man that is
not an expert, to always grasp the difference between
$300, we will say, and $3,000, the way it is frequently
written." We cannot therefore concur in appellant's
contention that "the most casual and superficial ex-
amination in fact would have disclosed the fraud,"
and the failure to do so by examinations made "in the
regular course of business" does not, we think, justify
a conclusion that no such examination within the just
and proper construction of the representations in
question was in fact made. There is evidence that an
examining committee of the bank and a discount com-
mittee which met from time to time, discussed the af-
fairs of the bank and made such examinations of the
discounts as they deemed necessary. The president
did the same thing. There were also the usual exam-
inations by the national bank examiners. We con-
clude therefore that the statements or representations
made in the certificate dated January 22, 1902, pre-
ceding the first renewal of the bond were justified by
the facts and were substantially true. It is no doubt
true that a careful and thorough examination by an
expert might and probably would have detected the
fraud, but the bank did not represent that any such
examination had been made, and were not required to
do so by the guaranty company. Such expert exam-
ination would not have been an examination "in the
regular course of business." An expert accountant in
appellant's employ testified that "no man in the ordi-
nary course of business can be as thorough as we are."
We conclude therefore that the statements or repre-
sentations contained in the certificate of January 22,

1902, preceding the first renewal of the bond were honestly made, were believed to be true and were substantially true and justified by the facts when made.

It is to be borne in mind that while a surety or guarantor is a favorite of the law and its contract is to be construed most liberally in its favor, this is not so as to a contract of insurance. In Guarantee Co. v. Mechanic's Savings Bank & Trust Co., 80 Fed Rep. 766-773, it is said that "in an insurance like this, the insurer and the insured deal at arms' length with each other," that "an employer would need no insurance against that close and relentless vigilance which makes stealing impossible, and under these contracts he is bound to no watchfulness except that which he has contracted to use in plain words for the benefit of the insurer." While that case was reversed by the U. S. Supreme Court on other grounds (Guarantee Co. v. Mechanic's, etc., Bank, 183 U. S. 402) we are of opinion that the language quoted correctly states the law applicable in the case at bar. The purpose of an insurance contract is to make good any loss or damage caused by dishonesty or bad faith in the employe. Am. Surety Co. v. Pauly, 170 U. S. 133-144. In so contracting the company takes the ordinary risks of loss from such causes. It undertakes to relieve the employer from such risks to the extent of and in accordance with the terms of the contract. It is undoubtedly in accord with sound public policy that having so undertaken, it should not be relieved of the fulfillment of its obligations to the assured upon the ground that the latter might by the exercise of extraordinary and constant vigilance, not provided for nor contemplated by the terms of the contract, have discovered and prevented the loss in whole or part. It is to guard against dishonesty and bad faith not known or likely to be apparent in the ordinary course of business that the insurance contract is taken out. The certificate of the bank here in question is in a form provided by the insurer. Its statements do not purport

to be and are not warranties. They are not to be so construed where, as here, there is no intent manifested to make them such. Missouri, K. & T. T. Co. v. German Nat. Bank of Denver, 77 Fed. Rep. 117-119, and cases there cited. The certificate of the bank did not purport to and did not guarantee that the books were in fact correct, nor that any expert examination had been made. See Am. Bonding Co. v. Spokane Building & L. S., 130 Fed. Rep. 737-741. The most that could be required was the exercise of reasonable diligence and good faith by the bank, and whether it so acted was a question of fact upon which the finding is, we think, justified by the evidence.

Appellee has assigned cross-errors and contends that each renewal or continuance of the bond was in effect a new contract of insurance for the year covered by such renewal or continuance; that the Circuit Court should therefore have found the bank entitled to recover $20,000 and interest instead of $10,000 and interest. We are unable to concur in this contention. By the renewal agreement the company "hereby continues in force Schedule Bond No. 2862 in favor of First Nat'l Bank, Dundee, Ills."; provided, however, "that the aggregate liability of the United States Fidelity and Guaranty Company from the date of the issuance of said schedule bond to the date of the expiration of this certificate for or on account of any act or acts of any one of said persons shall not exceed the sum written opposite that person's name upon the attached schedule." This is plain and unambiguous and cannot, we think, be construed as open to any other interpretation than that the total liability under the bond during the entire period covered by the renewals shall not exceed the original sum of $10,000. There are provisions of the bond itself which support this conclusion. Such seems to have been the original understanding of appellee, as manifested by the declaration filed in its behalf in the original suit at law.

In view of the conclusion stated it is not necessary to consider the certificate upon which the second renewal was issued. The decree of the Circuit Court must be affirmed.

'Affirmed.'