## 500

HOOPER–MANKIN FUEL CO. et al. v.
CHESAPEAKE & O. RY. CO.

Circuit Court of Appeals, Fourth Circuit.
January 23, 1929.

No. 2751.

J. Winston Read, of Newport News, Va. (Gibbs L. Baker, of Washington, D. C., on the brief), for appellants.

Charles E. Ford, of Newport·News, Va., and Henry Taylor, Jr., of Richmond, Va., for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and COLEMAN, District Judge.

WILLIAM C. COLEMAN, District Judge. This is an appeal from a judgment in favor of the appellee, the Chesapeake & Ohio Railway Company, hereinafter called the railway company, rendered by the District Court for the Eastern District of Virginia, in a suit at law brought by the railway company against the appellants, the Hooper-Mankin Fuel Company and the United States Fidelity & Guaranty Company, hereinafter called, respectively, the fuel company and the surety, under a bond given by them to the railway company. The precise terms of the bond are hereinafter set forth. The suit was originally instituted in the law and equity court of the city of Richmond, and from there removed to the District Court of the United States for the Eastern District of Virginia, where judgment was entered in favor of the railway company against the fuel company and the surety for $6,092.36, with interest. Because the judgment was inadvertently entered for this amount, which is in excess of the amount of the bond, namely, $5,000, a stipulation was filed in the case, crediting the judgment with the excess over the sum of $5,000.

There are 11 assignments of error, 2 of which have been waived. All of the remaining present substantially the same question, namely, whether there was a breach of the condition of the bond. The material facts are as follows:

The railway company, together with the fuel company and numerous other carriers and coal companies, was in 1923 a member of the Newport News Coal Exchange, Inc., an organization formed in 1920 to further the interests of shippers and carriers by facilitating the shipment of coal through the port of Newport News. Membership in the exchange was purely voluntary. Each member owned one share of its stock and, upon entrance, agreed to abide by the rules and regulations promulgated by the exchange. As an incident to membership, the fuel company gave to the railway company written authorization to accept from the exchange written orders to deliver to any vessel any coal for tidewater shipment, consigned to the exchange for the account of the fuel company, and the fuel company further entered into a written agreement with the railway company to pay it all freight and demurrage charges assigned to it by the exchange.

Under the rules and regulations of the exchange, each of its members consigned its coal to the exchange for its own· account. Under this pooling arrangement the exchange thus became the common consignee of all coal shipped, and the individual shipper got credit in the pool for his coal as soon as the ex-

change was notified of the particular shipment from the mines. Thereupon the exchange member could immediately dump equivalent tonnage without awaiting the physical arrival of his coal from the mines. While there was actually no physical intermingling of the coal, it was theoretically mixed with other coal in the exchange pool, and no member had a right to demand the delivery to a vessel of his particular cars, but merely tonnage from the same pool. The tariff in effect at the time provided for the delivery of cars to vessels out of their regular order of arrival, for the purpose of reducing switching and preventing delays, as a result of this substitution of cars of later for those of earlier arrival. There was thus a loss of identity of the cars. The railway company kept its demurrage record merely against the one consignee, the exchange. Debits accrued when the coal was delayed beyond the five days' free time period and Sundays and holidays, and credits arose when coal was released within the same period. If at the end of each monthly period credits equaled or exceeded the debits, there was no demurrage against the exchange; but, if debits exceeded the credits, the number of excess debits multiplied by the tariff rate of $2 per debit day was the amount of the railroad demurrage bill against the exchange for the given month. This arrangement, commonly known as the average demurrage principle, was provided for in the prevailing tariff. The rules and regulations of the exchange further provided that the railroad demurrage bill, computed as above explained, should be divided among and paid by the individual members of the exchange, in the proportion in which the default of each member of the exchange bore to the aggregate default of the entire defaulting membership of the exchange; no member being assigned any part of the demurrage bill unless the member had actually caused delay in releasing tonnage. Upon the railroad demurrage bill being thus apportioned by the exchange, each member was given an opportunity to check its correctness, after which the apportionment was certified by the commissioner of the exchange and returned to the railroad, which in turn rendered bills in·accordance therewith to the individual shippers.

Among the membership rules to which the fuel company, along with all other members, agreed, was the provision that each member would file a satisfactory undertaking or bond with the exchange to guarantee the credits extended from time to time, and conditioned also for the handling of each member's coal

in conformity with the rules and regulations of the exchange. There is, however, nothing in the record indicating that such bond was ever given. The corporate bond which is the basis of the present suit was not given under the aforegoing, but was given by the fuel company and the surety to the railway company on March 19, 1923, in the sum of $5,000, and contained the following provisions which are pertinent to the present controversy:

"Whereas, the Chesapeake & Ohio Railway Company has agreed that it will receive prepaid shipments from the above principal, and will deliver to the above principal shipments on which the transportation charges have not been paid, without first exacting payment of the charges thereon:

"Now, therefore, the condition of this obligation is such that if the principal shall, prior to the expiration of the credit period now in force or which may hereafter be established by the Chesapeake & Ohio Railway Company, pay, or cause to be paid to the said railway company, all of such charges, then this obligation shall be void; otherwise, to be in full force and effect. * * *"

It is conceded by the fuel company and the surety that the words "transportation charges," as used in the bond, include demurrage charges, and this court has so held. Davis v. Timmonsville Oil Co. (C. C. A.) 285 F. 470. It is further conceded that the charges are legal and correctly computed in accordance with the effective tariffs and the rules of the exchange. See Emmons Co. v. Norfolk & Western R. R. Co., 272 U. S. 709, 47 S. Ct. 254, 71 L. Ed. 485, by which the validity of the form of tariff here involved and of the so-called average demurrage principle under which the exchange operated, has been settled by the Supreme Court.

■ Nevertheless, the fuel company and the surety contend that, since the bond in the present case is conditioned for the payment of transportation charges on shipments received by the railway company, and since none of the cars on which the demurrage accrued are shown to have been identified as cars shipped by the fuel company, there can be no liability under the bond, and that to create such liability would be to extend, by implication, its expressed meaning; that is to say, the fuel company and the surety contend that, whereas, the present bond would cover transportation charges on cars shipped by or delivered to the fuel company as an individual shipper, yet, when such shipper enters into an agreement with other shippers, whereby their coal is pooled and the

aggregate demurrage of all of the shippers is apportioned among those accruing the demurrage, then the bond is inapplicable. While in the Emmons Case, supra, the suit was also upon a bond of a shipper and its surety, given to the carrier, the construction of the bond was not, as here, in controversy.

We believe that the lower court was correct in overruling the contention of the fuel company and its surety. If, in fact, the parties had intended so to limit the bond, they should have employed language expressive of this intention. There is nothing in the words used that indicates that the bond was other than one covering, up to the named amount, and within the designated credit period, transportation charges on all shipments not prepaid, but charged to the account of the fuel company. As was said by the lower court: "The bond was given two years after the exchange began operation, and it must be assumed that the parties were familiar with the methods then in vogue." The record does not disclose that the fuel company was shipping any coal other than through the exchange, but in our opinion, if it had been, the bond would have covered credit extended on such shipments as well. Further, there is nothing in the bond to indicate that it was restricted to the one commodity, namely, coal, any more than to demurrage charges. In short, as we construe the bond, the sole implied limitation upon the scope of its applicability was that the transportation charges be legally made and correctly computed. Conceivably, during the life of the bond, the existing method of handling coal shipments at Newport News might have been completely discarded, and an entirely different one adopted; yet, if the latter were valid under the Interstate Commerce Act (49 USCA § 1 et seq.), the bond would have been equally applicable.

■ The fuel company has received from the railway company the transportation services for which it contracted and for which the law requires that it pay, pursuant to the published tariff. It would be unconscionable to deny recovery on the present bond, in the absence of clear proof that the bond was not intended to cover the present situation. It is argued that the railway company has other means of redress, either as the beneficiary under the other bond provided for in the exchange agreement (although not in evidence in the present case), or under the express agreement between the exchange and its members to pay the railway company the assigned proportion of demurrage. In answer to this, it is sufficient to say that, where one or more remedies are available, a party is not to be deprived of his right to elect which remedy he will pursue.

■ What we have said is not affected by anything contained in Leggett v. Humphreys, 21 How. 66, 16 L. Ed. 50, Guarantee Co. of North America v. Mechanics' Savings & Trust Co., 183 U. S. 402, 22 S. Ct. 124, 46 L. Ed. 253, Pacific County v. Illinois Surety Co. (D. C.) 234 F. 97, and similar decisions cited by the fuel company and the surety. It is, of course, true that, while the rule of strictissimi juris does not apply to sureties for compensation, they being governed rather by a rule of liberal construction as to liability —American Surety Co. v. Pauly, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977—nevertheless they are entitled to have their contracts interpreted in full accordance with ordinary legal principles, and their liability is not to be enlarged beyond the scope of the terms of their contracts. Still it is equally true, as was said by this court in Fidelity & Casualty Co. of New York v. Metal Window Products Co., 30 F.(2d) 56, decided January 14th, 1929, that "a compensated surety can only be relieved where the circumstances clearly justify such relief, and that the old rule as to the tender treatment of accommodation sureties does not apply to bonding companies that sell their credit for a stipulated price, known as a premium. They are, in equity, entitled to be treated on the same footing as a merchant who sells his goods on credit for a profit." See, also, Southern Surety Co. v. Plott et al. (C. C. A.) 28 F.(2d) 698; Pickens v. National Surety Co. (C. C. A.) 13 F. (2d) 759; National Surety Co. v. McCormick (C. C. A.) 268 F. 185. But where, as in the present case, the language is free from ambiguity, no real question of construction arises.

It follows from what has been said that all of the assignments of error, including the 5 which relate to the lower court's admission of evidence with respect to the operations of the Newport News Coal Exchange, are without merit.

The judgment of the lower court is accordingly affirmed.