## NATIONAL SURETY CO. v. WESTERN PAC. RY. CO.

(Circuit Court of Appeals, Ninth Circuit. October 28, 1912.)

### No. 1,987.

1. INSURANCE (§ 650*)—INDEMNITY INSURANCE—ACTION ON BOND—EVIDENCE.

A statement made in an application by a corporation to a surety company, as a basis for a bond indemnifying the corporation against loss through the dishonesty of its treasurer, that all checks drawn by him should be countersigned by another officer, is immaterial in an action on a subsequent bond, of a different tenor, not based on such application, and containing no reference to it.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1671, 1672; Dec. Dig. § 650.*]

2. INSURANCE (§ 669*)—ACTION ON INDEMNITY POLICY—INSTRUCTIONS.

The rule that checks drawn on a bank by a depositor should be charged against the deposits in the order in which they were made *held* properly applied in an action by a corporation on a bond indemnifying it against

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

loss through the negligence of its treasurer, based on his alleged negligence in making deposits in the bank after knowledge of its insolvency.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1771–1784; Dec. Dig. § 669.*]

**3. INSURANCE (§ 332*)—INDEMNITY INSURANCE—CONDITIONS OF CONTRACT—PRECAUTIONS AGAINST LOSS.**

A provision in a policy indemnifying a corporation against loss through the dishonesty or negligence of its treasurer, requiring the corporation to take all reasonable steps and precautions to prevent any loss for which the insurer would be liable, did not require it to examine the books of a bank in which the treasurer deposited its funds, to ascertain the bank's financial condition.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 875, 875½; Dec. Dig. § 332.*]

**4. INSURANCE (§ 669*)—ACTION ON INDEMNITY POLICY—INSTRUCTIONS—NOTICE OF LOSS.**

A policy indemnifying a corporation against loss through the dishonesty or culpable negligence of its treasurer provided that "immediate notice" should be given the insurer on "the discovery by the employer that a loss has been sustained, or of facts indicating that a loss has probably been sustained." A bank in which the treasurer deposited funds of the corporation failed, and 20 days after it closed the corporation gave notice of a claim under the policy, on the ground of culpable negligence of the treasurer in making deposits after he had notice of the bank's insolvency. *Held*, that in an action on the policy the court properly instructed that the closing of the bank alone did not charge the corporation with knowledge of any loss within the policy, nor did knowledge even of facts which raised a suspicion of fraud or negligence on the part of its treasurer, but that it had the right to wait before giving notice until it discovered facts which would justify a careful and prudent man in charging another with fraud or culpable negligence, and also properly instructed on the evidence that whether it gave immediate notice after having such knowledge, giving the term a reasonable and practical construction, was a question of fact for the jury.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1556, 1771–1784; Dec. Dig. § 669.*]

**5. INSURANCE (§ 539*)—NOTICE OF LOSS—"IMMEDIATE NOTICE."**

"Immediate notice" of loss under an indemnity insurance policy means no more than that degree of promptitude which is reasonable under the circumstances.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1328–1336; Dec. Dig. § 539.*

For other definitions, see Words and Phrases, vol. 4, pp. 3397–3402; vol. 8, p. 7681.]

Ross, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of California; Wm. C. Van Fleet, Judge.

Action at law by the Western Pacific Railway Company against the National Surety Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The defendant in error brought an action against the plaintiff in error to recover upon an indemnity bond. The parties will in this opinion be designated as they were in the court below, plaintiff and defendant. The substance of the complaint is that one J. Dalzell Brown was the treasurer of the plaintiff, and as such officer was intrusted by the latter with the depositing of its funds in a bank in the city of San Francisco; that on November 9,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

1905. the defendant issued to the plaintiff its indemnity bond, whereby it agreed to make good and reimburse to the plaintiff any and all pecuniary loss of money, securities, or other personal property belonging to the plaintiff, sustained by it by or through the personal dishonesty or culpable negligence of the said Brown as treasurer, up to the sum of $50,000; that thereafter, on September 17, 1906, the defendant, by an instrument known as an extension certificate, renewed and continued said indemnity bond in force to September 30, 1907, and on September 5, 1907, the defendant again by a renewal certificate renewed and continued in force said indemnity bond for a period of one year thereafter; that on October 24, 1907, said Brown, as treasurer of the plaintiff, deposited with the California Safe Deposit & Trust Company, a banking corporation in San Francisco, to the credit of the plaintiff, funds of the plaintiff in the sum of $150,000, and on October 26, 1907, deposited with said bank to the credit of the plaintiff its funds in the amount of $100,000; that at the time when each of said deposits was made the bank was insolvent, and was known to said Brown to be insolvent; that said Brown did not at any time inform the plaintiff of the fact that the bank was insolvent, but that prior to the suspension of payment by said bank the plaintiff had no notice or knowledge of its insolvency; that each of said deposits was made by Brown wrongfully and fraudulently, and with culpable negligence on his part, and with knowledge of the insolvency of said bank, and with knowledge that plaintiff was ignorant of the said insolvency; that on October 30, 1907, the bank suspended payment, and has not since resumed payment; that on January 14, 1908, upon a proceeding had in accordance with the laws of the state of California, the bank was ordered into involuntary liquidation, and a receiver was appointed for the purpose of such liquidation; that no part of said deposits so made by Brown as treasurer of the plaintiff has been withdrawn by the plaintiff, and the full amount thereof was on deposit with the bank at the time when it suspended payment, and no payment had been made to or for the account of the plaintiff on account of said deposits, or any part thereof; that the bank is wholly insolvent, and the depositors therein, including the plaintiff, will receive in the liquidation but a small percentage of the amount of their deposits, and the plaintiff will not receive much more than the sum of $50,000, and that the plaintiff by reason of said deposits has suffered loss in an amount largely in excess of the sum of $50,000.

The answer, after making certain denials, set forth the bond and specified certain particulars in which it is alleged that the plaintiff had failed to comply with the terms thereof, alleging that the bond provided that the company should not be liable for loss occasioned by mistake, accident, error of judgment, or by robbery, unless by or with the cognizance of culpable negligence of the employé, and provided as follows: "And 'culpable negligence,' as used in this bond, shall be taken and held to mean failure to exercise that degree of care and caution which men of ordinary prudence and intelligence usually exercise in regard to their own affairs." The answer further alleged that, if any loss occurred through the facts set forth in the complaint, they resulted from the mistake, accident, or error of judgment of Brown, and not otherwise. The answer set forth the condition of the bond, wherein it was provided that, "upon the discovery by the employer that a loss has been sustained, or of facts indicating that a loss has probably been sustained, the employer shall immediately so notify the company in writing at its principal offices in the city of New York, and shall, within the time limited in lines 29 to 32, inclusive, of this bond, make and furnish to the company in writing, at its principal offices in the city of New York, claim for and proof of loss, if any sustained, and failure to give such immediate notice, or to make such claim or such proof within such time, shall relieve the company from all liability hereunder on account of the employé causing such loss." The answer alleged that on and after October 30, 1907, the plaintiff discovered that it had sustained a loss, or had ascertained facts indicating that a loss had probably been sustained by it, through said Brown, and under the terms of the bond was required to notify the defendant immediately in writing, but no such immediate notice was given as required by the bond.

With these and other issues unnecessary to be set forth for the consideration of the case in this court, the case was tried before a jury, and a verdict was returned for the full amount of the stipulated liability upon the bond, and thereupon judgment was rendered.

Heller, Powers & Ehrman and Garret W. McEnerney, all of San Francisco, Cal. (William J. Griffin, of counsel), for plaintiff in error.

Warren Olney, Jr., of San Francisco, Cal., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] Error is assigned to the ruling of the court below in sustaining a demurrer to one of the defenses pleaded in the amended answer. That defense was that in 1903, two years prior to the issuance of the bond which is sued upon, the defendant issued a bond insuring the plaintiff against loss through the personal dishonesty of Brown, which bond was procured upon an application or "employer's statement" made by the plaintiff, in which it was represented that Brown would sign checks or drafts on bank accounts only with the countersignature of the secretary of the plaintiff; that during the entire month of October, 1907, and for many months prior thereto, Brown, as treasurer of the plaintiff, had signed checks and drafts on its account with the bank without such countersignature of the secretary of the plaintiff, or any other person; that in said employer's statement it was said that the same was to be taken as a condition precedent to and the basis of the bond applied for, "or any other bond that may be executed by the National Surety Company to the undersigned upon applicant above named in said position, or any renewal or continuation of such suretyship." Now the facts as they were stipulated are that in 1904 there was a renewal of the bond of 1903 and a continuation of such suretyship for another year, but that before the expiration of the term of that bond so renewed it was canceled, and in lieu thereof a new bond was issued by the defendant, which is the bond now sued upon, and that such bond is not the same kind of a bond as that which was issued upon the "employer's statement" of 1903. The bond that was issued upon that statement was a bond insuring the plaintiff against loss through Brown alone in the sum of $250,000, and the liability of the defendant was limited to loss occurring through Brown's personal dishonesty. The bond which is sued upon here is a schedule bond, issued, so far as the record shows, upon no employer's statement, covering indemnity against losses through a large number of the employés of the plaintiff in its various offices and stations in California, Nevada, and Utah, specifying the liability assumed as to Brown to be $50,000, and specifying the liability assumed as to each of the other employés named in the schedule, in sums ranging from $500 to $25,000, and as to Brown it insures against loss through his culpable negligence, as well as his personal dishonesty. There is no reference in the bond to any employer's statement or application, and it is admitted that at the time of the issuance of that bond the employer's statement

of November 14, 1903, was in no way mentioned or referred to between the plaintiff and the defendant, and no other employer's statement or representations relative to Brown or the risk covered by the defendant in assuming such insurance as to him was given or required of the plaintiff. In view of these facts, we think there was no error in the ruling of the court below. The statements contained in the application of 1903 were the conditions of the bond which was issued thereupon, and of any renewal of such bond. The bond of 1905 cannot in any proper sense be said to be a renewal of the bond of 1903. It insured against loss through Brown, as treasurer of the plaintiff, it is true, but at a greatly reduced liability, and upon different conditions, and as one of a large number of employés. Section 2605 of the Civil Code of California provides that any statement which is to be incorporated in a policy of insurance must be referred to in the policy. The parties to the original bond of 1903 were not prevented by the terms of the contract then made from entering into any contract of insurance thereafter upon different terms, as they have done in this case as we read the record.

[2] Error is assigned to the following portion of the instructions of the court to the jury:

"The evidence in this case shows without conflict that approximately all of the $250,000 so deposited by Brown on the 24th and 26th of October, 1907, remained in the bank when it closed. The credit balance which the Railway Company had in the bank from previous deposits was on the morning of October 24, 1907, approximately $384,000. Between that date and the time the bank failed there was paid out on the plaintiff's account approximately the sum of $387.000. By law this sum so paid out is to be charged against the balance which the Railway Company had on hand on the morning of October 24th, and not against the subsequent deposits."

It is not denied that the general rule is that where there is a running account, such as that between a depositor and a bank, consisting of debits and credits occurring at different times, the debits will be applied to the credits according to their priority in time. But it is said that an exception should be made in the present case, for the reason that subsequently to the dates of the two deposits referred to in the instruction large withdrawals of funds of the Railway Company were made by the payment of its checks, which had been drawn before, but not presented for payment until after, those dates, and that these withdrawals should be charged against the last deposits, and that, if so charged, nothing remained of those two deposits, and the plaintiff suffered no loss on account thereof. It is true that the general rule is one which is implied by law, and does not stand in the way of the performance of any agreement between the parties as to the application of payments, nor does it preclude a different application when justice so requires, and it is held that justice so requires in cases where there are successive bonds of different sureties, and where the rights and equities of third persons are involved. Nashville First Nat. Bank v. National Surety Co., 130 Fed. 401, 64 C. C. A. 601, 66 L. R. A. 777; Andrews v. Macon Exch. Bank, 108 Ga. 802, 34 S. E. 183. But we are unable to see that there are any rights and equities vested in the defendant which required a departure from the rule, or

that justice demanded that the withdrawals actually made after the time of the last payment should be charged against those deposits, so that the plaintiff should go out of court for error made in its proof of loss and in its complaint, and the defendant should be discharged from liability on the bond; for, however the account of the plaintiff with the bank may be adjusted, there will remain a loss for which the defendant is liable on its bond, since the bank had been insolvent for many months prior to October, 1907, and Brown was aware of that fact. Equity does not require that an exception to the general rule shall be made in order to permit the defendant to present a defense which otherwise it could not make to a just cause of action.

[3] The court, in charging the jury, after having referred to the fact that it appeared without conflict from the evidence that the only relation between the plaintiff and the bank was that of depositor and banker, said that such relation did not require the plaintiff, under the conditions of the bond, to make examination into the books of the bank to ascertain its condition. It is contended that this instruction was error, for the reason that the bond by its terms required the plaintiff to take and use all reasonable steps and precautions to detect and prevent any act or omission on the part of any employé which would tend to make the company liable for any loss, and that the court should have submitted to the jury the question whether such examination of the condition of the bank was a reasonable precaution to have been taken by the plaintiff. We find no merit in the contention. No authority is cited to support it, and it is probable that none can be found. It is not pointed out how or by what authority the plaintiff could have procured inspection of the books of the bank or could have ascertained its condition. The right of inspection of a bank's books belongs to the directors and stockholders only, and the latter may not exercise the right upon mandamus without showing that a useful purpose is to be accomplished thereby. We take it that the provision of the bond so relied upon imposes upon the plaintiff the obligation of exercising the supervision and observing the precautions of a reasonably prudent employer, and exercising such diligence as he would exercise if there were no insurance. But it is said that the express terms of the bond required such examination in providing that:

"When any employé for whom the company is surety hereunder is acting in the position of joint agent for the employer and any other person, company, or corporation, joint audits of his books and accounts shall be made by the employer and such other person, company, or corporation."

This provision very clearly refers to books and accounts kept by the employé. The books of the bank were not such books, and they cannot be said to be within the contemplation of the provision of the contract so quoted.

[4] The principal question in the case is whether the trial court erred in its instructions whereby it submitted to the jury the question whether under the terms of the bond the plaintiff gave the defendant timely notice of its loss. The contingency upon which by the terms of the bond the insured was required to give "immediate notice" to the surety company was "the discovery by the employer that a loss has

been sustained, or of facts indicating that a loss has probably been sustained." It is not contended that the plaintiff had actual knowledge prior to the time when the notice of November 20th was given that a loss had been sustained; but it is urged that when the bank closed its doors on October 30th, or very soon thereafter, the plaintiff discovered facts which indicated that a loss had probably been sustained. The mere fact that the bank closed its doors imported notice to the plaintiff that it might sustain a loss as a depositor; but it did not of itself convey notice that probably the plaintiff had sustained a loss for which it might have recourse against the defendant. To sustain a loss for which the defendant was liable on the bond involved, not only the insolvency of the bank and a resulting loss of deposits, but (a) that such insolvency existed at the time when the plaintiff's last deposits were made, and (b) that Brown knew that the bank was insolvent when he made them.

[5] In Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 Sup. Ct. 833, 46 L. Ed. 1193, it was held that immediate notice means no more than that degree of promptitude which is reasonable under the circumstances, and such is the rule of all the decisions. Ordinarily the question whether the notice is given with due diligence under all the circumstances of a particular case is for the jury to answer. 2 May on Insurance, § 462; 4 Joyce on Insurance, § 3292. If upon the undisputed facts the minds of reasonable men would not differ, the question is one of law for the court; but, where reasonable minds may differ upon the proven facts, the question is for the jury. The trial court instructed the jury that the plaintiff was not required to give notice to the defendant until it had discovered that Brown was guilty of culpable negligence in making the deposits when he knew the bank was insolvent, or had discovered facts indicating a probability of such fraud by Brown, and had discovered that it had suffered loss by reason thereof. The court said that the closing of the bank doors and the discovery by the plaintiff therefrom that a loss had been suffered by defendant was not necessarily conclusive that the plaintiff should at once have given notice to the defendant, and directed the jury to take into consideration all the circumstances and conditions then existing as known to the plaintiff, and therefrom to determine the time when the plaintiff discovered or had information of facts indicating that Brown had probably been guilty of fraud or culpable negligence resulting in loss to the plaintiff, and the court added that the plaintiff was not required to give the surety company notice upon discovery of facts that would merely raise a suspicion of fraud or culpable negligence on the part of Brown; that it had the right to wait until it discovered facts that would reasonably do more than raise a mere suspicion; that it had a right to delay giving notice until it discovered facts that would have justified a careful and prudent man in charging another with fraud or culpable negligence. Said the court:

"The words 'immediate notice,' as employed in the bond, are to be given a reasonable and practical construction, and are to be taken as requiring the plaintiff only to give notice as soon as was under all the circumstances of the case reasonably practical."

Involved in the determination of the question whether the notice of November 20th was given within a reasonable time are the two questions: First, were the facts which were discovered such as to show that a loss had probably been sustained? and, second, at what time were they discovered? If the provision of the bond is fairly susceptible of two constructions, one favorable and the other unfavorable to the insured, the former should be adopted, for the reason that the instrument was prepared by the insurer. If it had been the intention of the contracting parties that notice should be given upon the discovery of facts creating a suspicion that a loss under the contract had probably been sustained, the defendant should have so stipulated in the bond. "If the company intended that the bank should inform it of mere rumors or suspicions affecting the integrity of O'Brien, such intention ought to have been clearly expressed in the bond." American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977. In that case the court below had charged:

"It is not sufficient to defeat the plaintiff's right of action upon the policy that it be shown that the plaintiff may have had suspicions of dishonest conduct of the cashier; but it was plaintiff's duty under the policy, when it came to his knowledge, when he was satisfied that the cashier had committed acts of dishonesty or fraud likely to involve loss to the defendant under the bond, as soon as was practicable thereafter to give written notice to the defendant."

The Supreme Court approved those instructions and said:

"It may well be held that the surety company did not intend to require written notice of any act upon the part of the cashier that might involve loss, unless the bank had knowledge, not simply suspicion, of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty."

Of similar import are Ætna Indemnity Co. v. J. R. Crowe Coal & Mining Co., 154 Fed. 545, 83 C. C. A. 431; Ætna Indemnity Co. v. Farmers' Nat. Bank, 169 Fed. 737, 745, 95 C. C. A. 169; Perpetual Building & Loan Ass'n v. U. S. Fidelity & Guaranty Co., 118 Iowa, 729, 92 N. W. 686; Fidelity & Guaranty Co. v. Western Bank (Ky.) 94 S. W. 3; Remington v. Maryland Fidelity, etc., Co., 27 Wash. 429, 67 Pac. 989; Fidelity & Casualty Co. v. Bank of Timmonsville, 139 Fed. 101, 71 C. C. A. 299.

In view of these principles we think it is the fair construction of the words of the bond that they do not mean that notice shall be given upon the mere discovery of facts sufficient to create a suspicion of a loss, but that they mean that the notice is to be given only upon obtaining definite knowledge or receiving credible information sufficient to justify the plaintiff in preferring charges of culpable negligence against its employé. The evidence is undisputed that immediately upon the closing of the bank's doors the bank commissioners took charge of the bank and refused to give information concerning its condition, and that they gave out no statement until after November 20th, and that in the meantime the officers of the bank were assuring the attorneys and officers of the plaintiff that the bank was solvent and would soon reopen its doors.

The evidence which is relied upon as showing that the officers of the plaintiff were in the possession of knowledge which under the terms of the bond required them to give immediate notice is, in brief, the following: That the plaintiff discovered almost immediately after the closing of the bank that Brown had been holding up its checks, and that it had required Brown to resign his office as its treasurer. That on November 1st plaintiff's attorney, Mr. Cutcheon, in New York, telegraphed to Mr. Olney, its attorney in San Francisco, requesting him to send by wire a list of the stockholders of the bank. That the plaintiff's officers knew that the clearing house committee of San Francisco would not come to the assistance of the bank. That on November 1st Mr. Olney telegraphed to Mr. Cutcheon to stop payment of certain drafts for $100,000 of October 26th, and said, "Do not like the look of things," and that later on the same day he wired that his telegram advising stoppage of drafts until further advice was based upon the reluctance of the bank to show books and give the exact facts, adding:

"Subsequently, however, they gave us full access and all information requested. Advice in telegram is accordingly withdrawn."

That in his second dispatch of November 1st Mr. Olney referred to some of the large loans that had been made by the bank and said:

"The report is, and I think correct, that Brown has been spending money personally in a very lavish manner. * * * I suspect that the bank people have loaned considerable sums to speculative schemes in which they were interested. Further than this, have no information that would result in scandal."

That Mr. Olney testified that he had heard before the failure of the bank some suggestions that it was not a first-class bank. That somewhere between 1900 and 1903 he had heard that the bank had put more money into the Tesla proposition than it had any business to put into one scheme, and that the scheme was not a success, but that he had been informed that by the deal which the bank later made with the Gould interests it had retrieved itself. That he had no real information on these subjects, but heard rumors merely.

"I felt that it was not one of the strong banks of the country, but it was a second-rate bank."

As tending to controvert the inferences that might be drawn from this evidence, there is the testimony of the officers and attorneys of the bank, each of whom testified that up to November 20th he had no information of a definite character concerning any dishonest or fraudulent act on the part of Brown. Mr. Jeffery, the president, testified:

"I wrote the letter which is in evidence as the letter of November 20th as soon as I felt what seemed to me a reasonable suspicion that the acts of J. Dalzell Brown were not what they ought to have been. At the time that letter was written I had no definite information as to the character of his acts, or as to the real financial condition of the California Safe Deposit & Trust Company."

Mr. Olney testified:

"The statement was constantly given out that the bank commissioners and Mr. Dunsmuir [their custodian in charge of the bank] were preparing a re-

port that would show the condition of the bank. I sought to get information, and sought to know when this report would be out, and was constantly informed that it would be out shortly. In the meantime the bank commissioners were apparently giving every assistance to the bank officials, so that they might resume, and the bank officials were constantly giving out statements that they were going to resume within a short length of time."

He also testified that prior to December 1st he had—

"no information at any time, by rumor or otherwise, of any improper or dishonest conduct on the part of the officials or persons connected with the California Safe Deposit & Trust Company."

The important fact is to be borne in mind that the bank suspended during a time of general financial panic, when many solvent banks were forced temporarily to close their doors, and that therefore the closing of this bank did not have the significance that otherwise would attend such an incident, and did not of itself necessarily import insolvency. We are of the opinion that there is nothing in the evidence to indicate with any degree of definiteness that the officers of the plaintiff knew prior to November 20th Brown had been guilty of culpable negligence. The most that can be said in favor of the defendant's contention is that upon all the evidence minds of reasonable men might differ as to whether the officers of plaintiff had discovered facts that would probably indicate a loss to it under the provisions of the bond. Such being the case, there was no error in submitting the question to the jury.

We find no error for which the judgment should be reversed. It is accordingly affirmed.

ROSS, Circuit Judge (dissenting). November 9, 1905, the plaintiff in error issued to the defendant in error a bond, subject to the conditions and provisions therein contained, which were thereby made conditions precedent to the right of the insured to recover upon it, in the sum of $50,000, against "any and all pecuniary loss of money, securities, or other personal property * * * sustained * * * by or through the personal dishonesty or culpable negligence" of one J. Dalzell Brown. Brown was at the time treasurer of the defendant in error, and was such officer from some time prior to June 2, 1905, and continued such until October 31, 1907. He was also a director of the Railway Company until his resignation of that office on the last-mentioned day. During the same time he was the manager of the California Safe Deposit & Trust Company, a banking corporation doing business in the city of San Francisco, and remained such manager continuously until the suspension of that bank on the 30th day of October, 1907. He was manager of the bank and treasurer of the Railway Company when he committed the acts which are the basis of this action, of which facts all of the officers and directors of the Railway Company had knowledge at all of the times in question. As treasurer of the Railway Company he was required by its by-laws to deposit the moneys of the company in such banks only as should be designated by its board of directors, and it appears that the board designated the California Safe Deposit & Trust Company as such San

Francisco depositary. Unless otherwise ordered by the board of directors or the executive committee thereof, Brown was also authorized by the by-laws of the Railway Company to sign all checks and discharge all other duties connected with the finances of the company as should from time to time be assigned to him by the board of directors or the executive committee.

The general offices of the Railway Company were in New York, and during the times in question Mr. Edward T. Jeffery was its president, and Mr. F. W. M. Cutcheon, of New York, was its general counsel. Mr. Warren Olney, Jr., was its general attorney in San Francisco, where Mr. Bogue, who was a vice president of the company and its chief engineer, had charge of the construction department of the road. The general auditor was the head of the accounting department, and he would prepare in San Francisco a requisition for moneys as needed from time to time, to be certified by the vice president and chief engineer, and then forwarded to its president in New York. The Western Pacific Railway Company was at the time engaged in constructing a line of railroad from Salt Lake City to San Francisco. When a requisition for money was received by the president in New York, he would have it verified and then submit it to the executive committee, whereupon they would pass a resolution approving the requisition, which would then be delivered to the Bowling Green Trust Company. The Bowling Green Trust Company would draw checks on the various depositaries of the funds of the Railway Company, which checks the president indorsed. They were then deposited with the banking firm of Blair & Co. in New York to the credit of the Western Pacific Railway Company. The money was transferred from New York to San Francisco, where it was disbursed, by drafts of the treasurer in San Francisco on Blair & Co. On the 24th of October, 1907, Brown, as treasurer of the Railway Company, acting upon telegraphic instructions from its president, drew on Blair & Co. for $150,000, and on the 26th of the same month drew under like instructions on Blair & Co. for an additional $100,000. Those amounts so drawn were credited on the respective dates on the books of the California Safe Deposit & Trust Company to the account of the Western Pacific Railway Company, at which time the Safe Deposit & Trust Company was insolvent, as Brown well knew. Indeed, the evidence shows, without conflict, that it had been insolvent for a long time preceding the said deposits. October 30, 1907, it was compelled to suspend and close its doors. At that time its books showed a balance in favor of the Western Pacific Railway Company of $250,-789.39. The count of the complaint upon which the defendant in error recovered proceeded upon the theory that the acts of Brown in making the deposits of October 24 and 26, 1907, were acts of "personal dishonesty" or "culpable negligence" within the meaning of the bond in suit, and that those acts caused a "loss" to the Railway Company; its allegations being, among other things:

"That on the 24th day of October, 1907, said J. Dalzell Brown, as treasurer of the plaintiff as aforesaid, did deposit with the California Safe Deposit & Trust Company, to the credit of the plaintiff, funds of the plaintiff in the

amount of one hundred and fifty thousand dollars ($150,000), and did likewise, as such treasurer, on the 26th day of October, 1907, deposit with said California Safe Deposit & Trust Company to the credit of the plaintiff the funds of the plaintiff in the amount of one hundred thousand dollars ($100,000). That at the time each of said deposits was made as aforesaid the California Safe Deposit & Trust Company was insolvent, and known to said J. Dalzell Brown to be insolvent. That said J. Dalzell Brown did not at any time inform plaintiff of the fact that said bank was insolvent, and prior to the suspension of payment by said bank the plaintiff had no notice or knowledge of said insolvency. That said J. Dalzell Brown was at the time each of said deposits was made as aforesaid aware of said fact that the plaintiff was ignorant of the insolvency of said bank. That each of said deposits was made by said J. Dalzell Brown wrongfully and fraudulently and with culpable negligence on his part, and with knowledge of the insolvency of said bank, and with knowledge that the plaintiff was ignorant of said insolvency, and for the purpose of thereby assisting said bank at the risk of the plaintiff. * * * That no part of said deposits so made as aforesaid by said J. Dalzell Brown, as treasurer of the plaintiff, has been withdrawn by said plaintiff, and the full amount thereof was on deposit with said California Safe Deposit & Trust Company at the time it suspended payment as aforesaid. That no payment has been made to or for the account of the plaintiff on account of said deposits, or any part thereof. That said California Safe Deposit & Trust Company is wholly insolvent, and by reason thereof the depositors therein, including the plaintiff, will receive in liquidation only a small percentage of the amount of their deposits, and the plaintiff will not receive from said California Safe Deposit & Trust Company the amount of said deposits by very much more than the sum of fifty thousand dollars ($50,000). That by reason of said deposits so wrongfully, fraudulently, and negligently made by said J. Dalzell Brown as aforesaid the plaintiff has suffered loss in an amount largely in excess of the sum of fifty thousand dollars ($50,000)."

The Safe Deposit & Trust Company did not belong to the clearing house, but its checks were cleared daily through the Anglo-Californian Bank of San Francisco. For clearing the checks of the Trust Company the Anglo-Californian Bank required that the former should at all times maintain a credit balance with it of not less than $100,000. I extract the following from the testimony of an expert accountant, George T. Klink, introduced on the trial by the plaintiff:

"From the close of business on October 23, 1907, down to the closing of the bank on October 30, 1907, the only assets the bank possessed which were capable of ready transition into money were some small deposits in other banks, some cash, and some loans which possibly might be realized on. The lowest sum which I have found from the books of the bank it had on deposit with the Anglo-Californian Bank prior to the 23d day of October, 1907, was a balance on October 8, 1907, of $102,838.91. On the night of the 23d of October it was $105,338.45, and on the night of the 24th it was $103,033.26. I am familiar with the drafts, aggregating $150,000, which were drawn to the order of the California Safe Deposit & Trust Company on October 24th, and which bear the stamp of the Canadian Bank of Commerce on the reverse side. These drafts were deposited with the Canadian Bank of Commerce, and the California Safe Deposit & Trust Company checked against those drafts during the last week of its existence; that is to say, against its account in the Canadian Bank of Commerce. My impression is that out of the said sum of $150,000 deposited in drafts with the Canadian Bank of Commerce it gave to the Anglo-Californian Bank on the 24th and 25th of October $125,000. If no such amount had been deposited with the Anglo-Californian Bank, the account of the Anglo with the California Safe Deposit & Trust Company would on the night of the 25th of October have been overdrawn to the sum of $31,000. The withdrawals charged against the account of the

Western Pacific Railway Company with the California Safe Deposit & Trust Company subsequent to the 25th of October, 1907, amount to $312,611.87; that is to say, over $62,000 in excess of the $250,000 deposited by the Western Pacific Railway Company with the California Safe Deposit & Trust Company during the last week that the bank was open. The withdrawals of the railroad from the bank during the last week of the existence of the bank exceeded its deposits in the bank by the sum of $133,954.81. There was a reduction in its credit balance of that sum during this last week. The net reduction of all deposits on the commercial side of the bank during that period amounted to $237,000."

The bond sued on was executed November 9, 1905, and is known as a schedule bond, including many employés and officers of the Railway Company other than Brown. By the bond, which was duly extended to cover the times in question, the plaintiff in error, among other things, agreed to—

"make good and reimburse to the employer any and all pecuniary loss of money, securities, or other property belonging to the employer, * * * sustained by the employer by or through the personal dishonesty or culpable negligence of any employé for whom the company is or shall become surety hereunder, in connection with the duties pertaining to the position to which he has been or may be appointed by the employer."

And the bond further provided that:

"The company shall not be liable hereunder for any loss occasioned by mistake, accident, error of judgment on the part of any employé, or by robbery, unless by and with the connivance or culpable negligence of the employé, and 'culpable negligence,' as used in this bond, shall be taken and held to mean failure to exercise that degree of care and caution which men of ordinary prudence and intelligence usually exercise in regard to their own affairs."

And it further provided that:

"Upon the discovery by the employer that a loss has been sustained, or of facts indicating that a loss has probably been sustained, the employer shall immediately so notify the company in writing at its principal offices in the city of New York, and shall, within the time limited in lines 29 to 32, inclusive, of this bond, make and furnish to the company in writing, at its principal offices in the city of New York, claim for and proof of loss, if any sustained, and failure to give such immediate notice or to make such claim or such proof within such time shall relieve the company of all liability hereunder on account of the employé causing such loss."

There are other provisions of the bond upon which points are made and urged on behalf of the plaintiff in error, concerning which, in the view I take of the case, it is not necessary to make reference. One of the provisions of the bond, made thereby one of the conditions precedent to the right of the insured to recover upon it, is that in respect to the notice of loss. It reads:

"Upon the discovery by the employer that a loss has been sustained, or of facts indicating that a loss has probably been sustained, the employer shall immediately so notify the company in writing at its principal offices in the city of New York, and shall, within the time limited in lines 29 to 32, inclusive, of this bond, make and furnish to the company in writing, at its principal offices in the city of New York, claim for and proof of loss, if any sustained, and failure to give such immediate notice or to make such claim or such proof within such time shall relieve the company of all liability hereunder on account of the employé causing such loss."

The acts of Brown counted on as the basis of the present action occurred on the 24th and 26th days of October, 1907. The Safe Deposit & Trust Company suspended on the 30th day of that month. The record shows that immediately after such suspension, and on the same day, Mr. Olney and Mr. Evans, the general auditor of the Railway Company, went to the bank seeking information in respect to the account of that company. In his testimony Mr. Olney says:

"I heard that the bank closed almost immediately after the doors were closed. I went to Mr. Bogue's room, but I found he was not in, and then went down and gathered up Mr. Evans, and we went into the bank. I had learned, incidentally, that we were drawing large drafts on New York, and I wanted to find out where those drafts were. I immediately demanded of Mr. Brown all the drafts he had and where they had gone. I found some on his desk, and I promptly had him tear the signatures off. I then asked what our balance was, as shown by the paying teller's sheets. Mr. Evans said: 'We can tell that from our books.' I said: 'All right.' Then we went out. Mr. Evans reported that our books showed that we had only $12,000 in the bank. I promptly telegraphed the fact of the suspension of the bank to the East and that we had only $12,000 involved."

That telegram, which was sent in the afternoon of October 30th to Mr. Cutcheon, is as follows:

"California Safe Deposit & Trust Company has just suspended payment. Our balances are approximately as follows:

| | |
|---|---:|
| Western Pacific Railway Company | $13,000 |
| Standard Realty & Development Company | 3,000 |
| Boca & Loyalton Railway Company | 1,600 |
| Roberts Lumber Company | 18,000 |

"The condition of the $150,000, drafts for which were authorized by telegram this morning, is as follows: Brown as treasurer drew on Blair & Company in favor of Stone Company for $20,000. Brown as treasurer drew on Blair & Company in favor of California Safe Deposit & Trust Company for $130,000, but this draft was kept by Mr. Brown personally and was not delivered or deposited. It has been canceled. Balances given above accordingly represent all we have involved."

Later in the afternoon of the same day Mr. Olney discovered that the true balance of the Railway Company in the Safe Deposit & Trust Company was not represented by the books of the Railway Company, because of outstanding checks of the latter company which had not been paid. Thereupon he sent to Mr. Cutcheon a second telegram reading:

"Statement of our balances in California Safe Deposit & Trust Co. in previous telegram was incorrect and made no allowance for outstanding checks. A correct statement, taking bank balances yesterday afternoon, is as follows:

| | |
|---|---:|
| Western Pacific Railway Company | $250,000 |
| Standard Realty & Development Company | 3,000 |
| Roberts Lumber Company | 19,000 |
| Boca & Loyalton Railway Company | 3,000 |

"Outstanding checks:

| | |
|---|---:|
| Western Pacific Railway Company | $238,000 |
| Standard Realty & Development Company | 100 |
| Roberts Lumber Company | 1,500 |
| Boca & Loyalton Railway Company | 2,000 |

"If possible some arrangement should be made by which these checks can be met by the Western Pacific Railway Company here as they come in. The

amount of checks outstanding will be reduced by the amount of any checks cashed this morning. We cannot tell until to-morrow how much this is."

Both of the foregoing telegrams, according to Mr. Olney's testimony, were sent by him after 2:15 p. m. of October 30th, and would not have reached New York until 6 p. m. or later of that day. Mr. Olney followed those telegrams on the same day with the following letter to Mr. Cutcheon:

"This afternoon the California Safe Deposit & Trust Company suspended payment. You know they have never been a member of the clearing house, and the bank through which they cleared, the Anglo-Californian, this morning refused to act for them. As Mr. Bogue was out when I heard the news, I immediately hunted up Mr. Evans and we went together to see Mr. Brown. I was very much disturbed, as I knew drafts had been drawn for $150,000 by Mr. Brown as treasurer in favor of the California Safe Deposit & Trust Company, and I was afraid that he had sold them. We learned from him, however, that $20,000 of the $150,000 had been drawn by draft on Blair & Co. in favor of the Stone Company, and that drafts for the remaining $130,-000, which were in favor of the California Safe Deposit & Trust Company, had not been delivered by Mr. Brown or deposited, but had simply been kept by him personally. At our request the signatures on these drafts were torn off. It is now planned to draw a draft on Blair & Co. in favor of Utah Construction Company for approximately $100,000, which is due them. I have advised Mr. Bogue that he better have Mr. Brown draw a draft in favor of the Railroad Company for the balance of $30,000. Mr. Bogue could then hold this draft until advised from New York, and could bank it here in some other bank for the purpose of meeting current expenses. I feel that it is an excess of caution, but it seems to me better that Mr. Brown's authority to draw the $150,000 should be exhausted. It has been determined that Mr. Bogue will draw the draft for $30,000 to-morrow morning, and hold it, and wire Mr. Jeffery for instructions concerning it."

It appears that the next day, to wit, October 31st, Mr. Cutcheon telegraphed Mr. Olney as follows:

"Please ascertain immediately how it happens that Western Pacific has as much as two hundred fifty thousand dollars on deposit with California Safe Deposit & Trust Co. I suspect that Western Pacific checks that should have been drawn and delivered against deposit have been held up for some time and that investigation will show that most of these checks have been sent out within last day or two. Get this information if possible without charges or recrimination and give it to me at once. Please see all Mr. Jeffery's telegrams of to-day to Bogue and Evans. Give your personal attention to emergency requisition so as to be sure that we keep within requirements of mortgage. If you do not understand telegraph me."

In the afternoon of October 31st, Mr. Olney wired Mr. Cutcheon:

"Find that both Roberts Lumber Co. and Boca & Loyalton R. R. Co. are indebted to Cal. Safe Deposit & Trust Co. in larger amounts than their deposit. Accordingly no loss to these companies, but they have pay checks out to the amount of 28,000 for September and pay rolls for October will come in shortly. Judging from what little we can learn as to assets of California Safe Deposit & Trust Co. it will probably not resume payment for a considerable time."

And on the same day, October 31st, Mr. Cutcheon sent Mr. Olney two telegrams, the first of which reads:

"Please obtain complete list of shareholders of California Safe Deposit & Trust Co. and wire me names and holdings of most important stockholders."

And the second:

."Please investigate independently of Evans and report immediately con-
·cerning method adopted by California Safe Deposit of disposing of one hun-
dred thousand dollars draft of October 26th. It seems to me in view of the
financial situation here any bank in San Francisco with which this draft
was used must have insisted on taking it for collection. Do not be satisfied
·by mere statements on this point, look at the memoranda or other evidence
·of deposit held by California Safe Deposit. If draft was in fact sold and
paid for by check ascertain whether check has been honored by bank on
which same was drawn. If not get drawer to stop payment. If it has been
honored see that check and all evidences of transaction are carefully pre-
:served so that we may make claim upon Safe Deposit for preference as to
this payment upon ground of trust raised by fraud in transaction. Also ·
please investigate character of holder yourself and advise me immediately
whether there are outstanding any drafts upon Blair & Co. or Western
Pacific in New York other than one hundred thousand dollars of October
twenty-sixth in favor of California Safe Deposit twenty thousand in favor
Stone and one hundred and six thousand dollars in favor Utah Construction.
If so what, we have stopped payment of one hundred thousand draft of Octo-
ber twenty-sixth. Must know at earliest possible moment whether to revoke
stoppage of payment. Report facts rapidly as ascertained. This is very
important."

In answer to the first-above telegram of Mr. Cutcheon of October
31st, Mr. Olney replied by wire as follows: ·

"Will endeavor to get complete list of stockholders of California Safe De-
posit & Trust Company to-morrow. List of directors and shares held by
them as published in newspapers and probably correct is as follows: David
T. Walker, 800; J. Dalzell Brown, 667; W. J. Bartnett, 50; R. D. Fry, 600;
James Treadwell, 1,700; A. D. Sharon, 60; James H. Swift, 90; Edward H.
Harmon, 50; William C. Peyton, 90; William F. Barton, 87; James Salle,
200."

The next day, November 1st, Mr. Olney telegraphed Mr. Cutcheon:

"One hundred thousand drawn for by Brown on 26th ult. Was in shape of
·three drafts. Two for twenty-five thousand each and one for fifty thousand.
Keep stoppage on until advised. Do not like the look of things."

And later on the same day, November 1st:

"Drafts of October twenty-sixth aggregating one hundred thousand were
·apparently handled in the usual manner in vogue between California Safe
Deposit & Trust Company and Canadian Bank of Commerce. California
Safe Deposit & Trust Company has been carrying on account with Canadian
Bank. At the close of business on October twenty-fifth California Safe De-
posit & Trust Company had a credit on this account of three thousand and
one hundred and eighty-three dollars and forty-eight cents. On October
twenty-sixth it deposited on this account the drafts referred to and was given
a credit in the passbook issued by the Canadian Bank to California Safe
Deposit & Trust Company of one hundred thousand. No other deposits were
made on that day on this account. On the same day California Safe Deposit
·& Trust Company checked against this account as follows: National Bank
of Pacific twenty-five thousand. Coin twenty thousand. Anglo-Californian
Bank ·fifty thousand. Anglo-Californian Bank seven thousand five hundred,
leaving a balance at close of day of six hundred and eighty-three dollars and
forty-eight cents. We have seen bank book showing this deposit and entries
in cashbook for checks and also the return checks themselves. We find no
·entry in cashbook or in exchange account showing any exchange paid on
drafts, but find with returned checks from Canadian Bank slip charging Cal-
ifornia Safe Deposit & Trust Company with one-fourth of one per cent. dis-
:count on New York draft of one hundred thousand amounting to forty dol-

lars under date of twenty-sixth ultimo. This slip is stamped paid October thirtieth. This charge has not yet been entered in books of California Safe Deposit & Trust Company. Do not understand discrepancy between one-fourth of one per cent. of one hundred thousand which would be two hundred and fifty dollars and the actual charge of forty dollars. Balance of California Safe Deposit & Trust Company with Canadian Bank on October thirtieth as shown by books of California Safe Deposit & Trust Company is one thousand four hundred and eighteen dollars and fifty-two cents. Brown states that drafts were deposited in regular course to credit of California Safe Deposit & Trust Company and credit was given it therefor and then checked against it. Managers of Canadian Bank declare emphatically that drafts were sold to them on understanding that they would charge the current rate of exchange. My earlier telegram of this morning advising stoppage of drafts until further advised was based upon reluctance of California Safe Deposit & Trust Company people to show us books and give us exact facts. Subsequently however they gave us full access and all information requested. Advice in telegram is accordingly withdrawn and you must act upon facts as stated herein. Have no further information about assets and prospects of California Safe Deposit & Trust Company than sent heretofore except that a clearing house banker told me that clearing house banks would have protected California Safe Deposit Company if condition of its affairs could possibly have justified it, and that he saw list of securities submitted by Brown to banks at time he requested assistance and it was made up largely of securities of uncertain value, many of them being securities of the various schemes of people connected with bank. In glancing through books to-day looking for items concerning drafts it appears apparently that large amounts have been loaned some of these companies. There is a loan by bank to El Dorado Lumber Company two hundred and fifty thousand. Another to the Carnegie Brick & Pottery Company one hundred and fifty thousand. Report is, and I think correct, that Brown has been spending money personally in very lavish manner. He has been erecting an expensive residence at Clear Lake and is in some sort of a company that has purchased or arranged to purchase a large portion of the available frontage on that lake. I suspect that the bank people have loaned considerable sums to speculative schemes in which they were interested. Further than this, have no information as to anything that would result in scandal. Western Pacific credit here has been hurt and if Mr. Jeffery can see his way to do it he should make telegraphic transfers on the subtreasury here sufficient to enable us to obtain coin and meet outstanding unpaid checks and current bills. This will re-establish our credit more than anything else possible. This will be better than credit at any bank as banks here are doing business on clearing house checks solely."

And on the same day, November 1st, Mr. Olney sent to Mr. Cutcheon the following telegram:

"Complete statement of outstanding unpaid checks shows aggregate of $239,180.67. Of these $99,527.64 are checks to order of Utah Construction Co. which Jeffery arranged to care for at Salt Lake. Leave $139,653.03 which must be taken care of here. Find that with exception of checks aggregating $78,000 sent Utah Construction Co. on October 24th, very large proportion of these checks were not sent out until October 30th and had been delayed in mailing by Mr. Brown from one to eighteen days. Learn information given me yesterday that checks to Utah Construction Co. aggregating $78,000 had been returned and paid, was not correct. They are here now for payment. No mistake was made however in totals sent you."

The next day, November 2d, Mr. Olney telegraphed Mr. Cutcheon as follows:

"Find that checks, the sending out of which was delayed by Brown, were handed by him to clerk in office of assistant treasurer about two o'clock on

the afternoon of thirtieth with instructions to mail the same. Within an hour thereafter the bank suspended payment."

The telegrams and letter speak for themselves. Mr. Olney testified on cross-examination, among other things, as follows:

"I knew that J. Dalzell Brown was manager of the trust company. I would not say that I knew it was a one-man bank and that he ran it. I did not know much about it. I had heard before the failure of the bank some suggestion that it was not a first-class bank. The situation in that respect was this: Somewhere between 1900 and 1903 I had heard rumors that the bank had put more money into the Tesla proposition than it had any business to put into one scheme and that the Tesla scheme was not a success. I did not know that among well-informed people for the last four or five years the bank was regarded as being in infirm condition. I was also informed that by the deal which the bank made with the Gould interests, when they acquired the Western Pacific, it had retrieved itself from an unfortunate position. I had no real information on any of these matters. I heard rumors merely, from business associates. I felt that it was not one of the strong banks in the community—that it was a second-rate bank."

Mr. Olney also testified, among other things, as follows:

"The bank failed on the 30th. Within the next day or two I went to the bank to ascertain what had become of the drafts aggregating $100,000. At that time I saw entries on the books of the bank, casually, which indicated large loans to the Carnegie Brick & Pottery Company and to the El Dorado Lumber Company. Outside of this information to which I have just testified, the first definite information which I had that any considerable sum of money had been loaned by the bank in aid of enterprises conducted by officers of the bank was contained in a pencil copy of the memorandum of assets and liabilities that has been given to Mr. Taylor, and which Mr. Taylor copied on his way East and mailed back to me. When I received it I looked it over, and saw there were loans to some concerns with which I knew the bank was connected. That was the first definite and certain information that I had. I do not know as to when somebody may have told me that the bank had loaned money to concerns in which its officers were interested, but the above was the first real information that I had on the subject. I talked on the 30th or 31st of October or 1st of November with some banker whose bank was a member of the clearing house. I think it was on the 31st of October. He told me that Brown had offered a list of securities to the clearing house for the purpose of obtaining assistance for the bank, that they were not sufficient, and I think he told me that they were largely scheme securities of concerns in which the bank was interested. I am inclined to think he told me that this list of securities was largely made up of securities in various schemes maintained by the people connected with the bank. The man I was talking to was a banker of high standing for capacity and integrity, and in whose judgment in the matter in a general way I had implicit confidence. I knew for some time before the bank failed that Brown had been spending money lavishly in a personal way."

Mr. Olney further testified:

"When Mr. Cutcheon telegraphed to me to ascertain how it happened that the Western Pacific had $250,000 on deposit, I understood that he figured that the treasurer had held up those checks, but not necessarily in breach of his duty. He wired me to investigate the thing. I did not go to Mr. Brown and ask him why he delayed sending out those checks, because Mr. Cutcheon said to get the information without charges or recrimination. There would not have been much use in discussing it with Brown. I got the information right in our treasurer's office. I had it in mind that it was possible that Brown had deliberately held up those checks. We knew the checks had been held by Mr. Brown, but why he had held them up—whether he had

done it in the regular course of his duty and without any bad motive—we did not know, and we did not find out until we discovered what the real condition of the affairs of the bank was. There is not the slightest question but what it occurred to me as one of the possibilities that something might have been behind the holding up of these checks, that he might have held them up because, if they had been turned loose in the community, he would not have been in possession of the funds to pay them and that would have precipitated a suspension of the bank. It must have occurred to Mr. Cutcheon as well as myself. When I heard from a clearing house banker that the securities that Brown could offer in support of his application for assistance from the clearing house consisted largely of securities in enterprises which the insiders of the bank had promoted and maintained, I also heard a great deal of information and statement on the other side; and while I never at any time was confident that the bank would resume, yet I did not at that time have any information upon which I could base a positive opinion that it would not. I was always doubtful about the 'bank opening, but yet at the same time I did not believe that it would not, in the sense that I was ready to act upon that belief. I simply did not know."

The evidence also showed, without dispute, that there was no run upon the bank, and that it collapsed because of the improper, if not fraudulent, disposition of its resources. As a matter of course Brown must be held to have known of its insolvent condition. Indeed, that is not disputed. Nor is there any conflict in respect to any of the facts above detailed. That Brown withheld the checks of the Railway Company in order to prevent the closing of the bank in the probable hope that some turn might bring relief, or in order to defer the evil day as long as possible, is perfectly evident; and that both Mr. Cutcheon and Mr. Olney considered at least that such was probably the fact is equally clear from the telegrams that passed between them. Beyond doubt those telegrams, and the other uncontradicted evidence in the case, show that Brown was guilty of at least "culpable negligence," if not of fraud, in his dealings with the funds of the Railway Company, and that his acts in depositing $250,000 of that company's money in the insolvent institution on the 24th and 26th days of October would not only "probably," but almost certainly, result in loss to the Railway Company. Nevertheless, the first notice of any character conveyed to the Surety Company was contained in the following letter from the president of the Railway Company:

"Office of the President, 195 Broadway, New York.
"Confidential. November 20, 1907.
"Dear Sirs: Circumstances attending the suspension of the California Safe Deposit & Trust Company, of which J. Dalzell Brown, treasurer of the Western Pacific Railway, was manager, have led us to believe that our interests may have been sacrificed by Mr. Brown, or by Mr. F. C. Lewis, our assistant treasurer, and that loss has resulted to the company from the acts of one or both of them. At present we have hardly more than a suspicion (and this concerns Mr. Brown only), and the grounds of our suspicion are not definite enough to warrant our giving you any facts in writing; but we are very willing to give to a representative of your company orally any facts that we have. We shall inform you of any further facts bearing on this matter which may be discovered as soon as ascertained.
"Yours truly, E. T. Jeffery, President.
"National Surety Company, 115 Broadway, New York."

In response to this letter, one of the attorneys of the Surety Company called on Mr. Cutcheon, the result of which interview is given by the latter in his deposition as follows:

"I told him that I had nothing in the way of real information, other than circumstantial information. I told him that we knew a considerable number of checks which had been drawn by Mr. Brown upon the company's bank account were outstanding, and it seemed to us that the checks should have been sent out and cashed before the failure of the bank. I told him of the sale of a draft or drafts by the California Safe Deposit & Trust Company to one of its local correspondents in San Francisco, and that the fact that there had been such a sale during panic conditions prevailing all over the country had excited my suspicions to a certain extent, when connected with other matters. I told him, on the other hand, of Mr. Bartnett's earnest assurances that the company was solvent. I also gave him some other facts which I do not recall; but I gave him the details of information in our possession concerning the whole subject, and I told him that we had only suspicions founded upon those details, but because of those suspicions I had advised the writing of the letter he brought with him. That is the substance of the conversation so far as I can remember. I ought to add that I told him about the closing of the institution, and that it was in the hands of the bank commissioners, who had not afforded us any facilities for information, although we had asked for them."

No further notice was given the plaintiff in error until December 19, 1907, when Mr. Jeffery wrote to it the following letter:

"New York, December 19, 1907.

"Dear Sirs: On November 20th we wrote you that circumstances attending the suspension of the California Safe Deposit & Trust Company had led us to believe that our interests might have been sacrificed by Mr. J. Dalzell Brown, our former treasurer, or by Mr. F. C. Lewis, our assistant treasurer, both of whom were bonded by you. At an interview with your counsel, our general counsel, Mr. Cutcheon, stated the facts as then known to us. Since that interview our grounds for belief that Mr. Brown has been guilty of misconduct have been greatly strengthened, although unfortunately the fact that the bank commissioners have been in control of the California Safe Deposit & Trust Co., so that we have had no opportunity to examine into its affairs, has greatly retarded us in securing exact information. The bank commissioners have, however, reported that the Trust Company is insolvent and have asked for the appointment of a receiver, and there seems to be no doubt that a receiver will be appointed within the next few days. As you know, Mr. Brown was the manager of the Safe Deposit Company. He has been arrested for felony in converting securities held by the company in trust and possibly for other alleged crimes (our information upon that point is indefinite), and we believe that his bail has been fixed at $200,000, and that he has been unable to secure bondsmen.

"In view of the disclosures that have been made as to his conversion of securities and his reported confession of false entries made by him upon the books of his bank, it seems morally certain that he knew of the insolvency of his institution at least prior to October 24th (the bank closed its doors on October 30th). From time to time, as treasurer of the Western Pacific Railway Company, Brown drew drafts upon the company's bank account in New York and deposited the same with the Safe Deposit Company. On October 24th, as treasurer of the Western Pacific, he drew drafts upon its bankers in New York for $150,000 and deposited the drafts in the California Safe Deposit & Trust Company. These drafts were paid by our bankers prior to the failure of the Safe Deposit Company. On October 26th Brown drew drafts for $100,000 in the same way and deposited the same with the Safe Deposit Company. These drafts had not been presented when the Western Pacific learned of the failure of the Safe Deposit Company and payment upon them was stopped pending investigation. It may be that the company

will find it necessary to pay these drafts. In the regular course of business, checks against the deposits mentioned would have been drawn by Brown and sent out immediately after the making of the deposits. The checks were in fact drawn and signed by the assistant treasurer. They were given to Brown for signature or countersignature and mailing by him. Instead of signing and mailing them, he held them in his own possession until October 30th, when, just prior to the suspension of the Safe Deposit Company, he signed and mailed the checks, all of which, of course, the company has been obliged to pay or will be obliged to pay. (As a matter of fact, practically all of these checks have already been taken up by our company.) None of them, of course, was paid by the California Safe Deposit & Trust Company. The checks which Brown thus withheld aggregated approximately $200,000. There seems to be no doubt either that, had these checks been drawn and mailed in due season, they would have been paid, or that when the deposits were made the Safe Deposit Company [was] known to Brown to be insolvent, and that he, as treasurer, deposited the drafts referred to, knowing that the Railway Company would be involved in loss to that extent. In either case, the company has probably suffered through Brown's acts to the extent of considerably more than the amount for which he was bonded by your company.

"We have no reliable information as to the condition of the California Safe Deposit & Trust Company, other than a very general statement of its condition on October 30th and an unofficial estimate of the value of the assets included in the statement. We are informed that several millions have been loaned by the Trust Company to unsubstantial concerns in which its officers and directors were interested upon relatively valueless collateral. It seems likely that the bank will not be able to pay, even at the end of a complete liquidation, more than 50% of its indebtedness, if, indeed, it prove able to pay so much. So far as Mr. Lewis is concerned, we have no information that leads us to believe that he actively co-operated in any of Mr. Brown's misdeeds. There is, however, reason to believe that he was negligent in not following up the checks that were drawn and given to Mr. Brown for signature, and that, had he been vigilant in the attention to his duties, all or some portion of the loss suffered might have been avoided.

"Very truly yours,                                        E. T. Jeffery,
                                                "President Western Pacific Railway Co.
"National Surety Company, 115 Broadway, New York City."

Passing the question as to whether the Railway Company is properly chargeable, under the circumstances appearing, with the notice of the insolvency of the Trust Company which the joint agent, Brown, necessarily had, the uncontradicted evidence shows that it was well aware of all of the facts to which I have specifically referred. Counsel for the defendant in error contends that, until it became convinced that Brown had been guilty of "fraud," it was not required to give the notice provided for by the policy in suit; and in one of the instructions of the court below, duly excepted to by the defendant to the action and assigned as error here, the jury was expressly told that:

"The plaintiff was not required to give notice to the Surety Company until it had discovered such fraud, or facts indicating the probability of such fraud, and that the plaintiff had suffered loss by reason thereof."

I think it is impossible to sustain that position, in view of the provisions of the policy in suit, which, as has been seen, undertook to "make good and reimburse to the employer any and all pecuniary loss of money, securities, or other personal property belonging to the employer. * * * sustained by the employer by or through the personal dishonesty or culpable negligence" of Brown, and provided as

one of its conditions that "upon the discovery by the employer that a loss has been sustained, or of facts indicating that a loss has probably been sustained, the employer shall immediately so notify the company in writing, at its principal offices in the city of New York, * * * and failure to give such immediate notice * * * shall relieve the company from all liability hereunder on account of the employé causing such loss," and by which all of its conditions and provisions were expressly made conditions precedent to the right of the insured to recover upon it. By the express terms of this policy the Surety Company was therefore liable to the defendant in error, not only for fraud on the part of Brown, but also for his "culpable negligence," and in the case of either fraud or culpable negligence by him was entitled to the prescribed notice.

Counsel for the defendant in error insists that the Railway Company was not obliged to give the Surety Company any notice until the former was justified in "preferring charges" against Brown; and the court below, in one of its instructions to the jury, duly excepted to and assigned as error, told them that the Railway Company had "a right to delay giving notice until it discovered facts that would have justified a careful and prudent man in charging another with fraud or culpable negligence." Much reliance is placed by counsel for the defendant in error, in support of their contention, upon the case of American Surety Company v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977, which they say "involved an indemnity bond whose language was the same in substance as that of the bond here." But counsel are entirely mistaken in saying that the provision in respect to notice in the bond involved in that case was substantially the same as in the bond here in suit; on the contrary, the two provisions are very substantially unlike. By the bond in the Pauly Case the Surety Company agreed to "make good and reimburse to the employer all and any pecuniary loss, sustained by the employer, of moneys, securities, or other personal property in the possession of the employé * * * by any act of fraud or dishonesty on the part of the employé. * * *" And the provision in respect to notice was "that the company shall be notified in writing, at its office in the city of New York, of any act on the part of the employé which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer." Clearly, under that bond the surety was liable only for the fraud or dishonesty of the employé, and the notice required was of acts for which it was liable; that is to say, fraudulent or dishonest acts of the employé—notice of which fraudulent or dishonest acts was required to be given "as soon as practicable" after their occurrence had come to the knowledge of the employer. It was in respect to such provisions that the Supreme Court held that the Surety Company "did not intend to require written notice of any act upon the part of the cashier that might involve loss, unless the bank had knowledge, not simply suspicion, of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty. If the company intended that the bank should inform it

of mere rumors or suspicions affecting the integrity of O'Brien, such intention ought to have been clearly expressed in the bond." 170 U. S. 147, 18 Sup. Ct. 558, 42 L. Ed. 977.

Similar to the Pauly Case are those of Ætna Indemnity Co. v. Crowe Mining Co., 154 Fed. 545, 83 C. C. A. 431, and Ætna Indemnity Co. v. Farmers' National Bank, 169 Fed. 737, 95 C. C. A. 169, also relied upon by the defendant in error. In each of those cases it will be seen that the covenant in respect to notice was qualified, and that the obligation to give notice did not arise until the delinquency of the employé was absolutely discovered; for it is obvious that, until the assured is in possession of facts upon which he can predicate notice, the obligation to give it does not and cannot arise. How different are the provisions of the policy in suit, where, as has been shown, the Surety Company made itself liable, not only for the "fraud," but for the "culpable negligence," on the part of Brown, "immediate" notice of which to the Surety Company was expressly required and made a condition precedent to recovery upon the bond.

The court below instructed the jury, among other things, as follows:

"In this case, as above stated, Brown is alleged to have been guilty of personal dishonesty or culpable negligence in making the deposits in question when he knew the bank was insolvent, and you will observe, therefore, that the fraud on the part of Brown is an essential element. Accordingly the plaintiff was not required to give notice to the Surety Company until it had discovered such fraud, or facts indicating the probability of such fraud, and that the plaintiff had suffered loss by reason thereof. The closing of the bank's doors, and the discovery by the plaintiff therefrom that a loss had been suffered by it, is not necessarily conclusive that the plaintiff should have at once given notice to the defendant Surety Company. You have the right to and should take into consideration all the circumstances and conditions then existing and making up the whole situation as known to the plaintiff, and from them determine as to the time when the plaintiff discovered or had information of facts indicating that Brown had probably been guilty of fraud or culpable negligence resulting in loss to the plaintiff."

And also:

"The plaintiff was not required to give the Surety Company notice upon the discovery of facts that would merely raise a suspicion of fraud or culpable negligence on the part of Brown. It had the right to wait before giving notice to the Surety Company until it discovered facts that would reasonably do more than raise a mere suspicion. It had a right to delay giving notice until it discovered facts that would have justified a careful and prudent man in charging another with fraud or culpable negligence. Nor was it incumbent upon the plaintiff upon discovery of Brown's fraud, or of facts indicating that Brown had probably been guilty of fraud upon the plaintiff, to instantly notify the Surety Company. The words 'immediate notice,' as employed in the bond, are to be given a reasonable and practical construction, and are to be taken as requiring the plaintiff only to give notice as soon as was under all the circumstances of the case reasonably practicable."

To both of which instructions the defendant to the action excepted, and which it here assigns as error. And the court refused this, among other instructions requested by the defendant to the action, the plaintiff in error here:

"If you find that on or before the 1st day of November, 1907, the plaintiff had discovered or knew that the California Safe Deposit & Trust Company

had suspended payment, and had discovered or knew that J. Dalzell Brown, as treasurer of the plaintiff, had dishonestly or with culpable negligence delayed the signing of checks of the plaintiff against its deposit in the bank, and had discovered or knew that by reason of these facts such checks had not been presented to and paid by the bank before its suspension, and had discovered or knew that Brown had deposited to the credit of the plaintiff on the 24th and 26th days of October, 1907, funds aggregating $250,000, and had discovered or knew that it had to its credit in the bank at the time of its suspension approximately $250,000, and had discovered or knew facts indicating that the assets of the bank would probably not equal in value its liabilities, I instruct you that the plaintiff had then discovered facts indicating that a loss within the bond had probably been sustained, and it became its duty to give immediate notice to the defendant. If you find these facts, and further find that such immediate notice was not given by the plaintiff to the defendant, your verdict must be for the defendant."

To which action of the court the defendant to the action reserved an exception, and assigns it as error.

In the case of Guarantee Company v. Mechanics', etc., Co., 183 U. S. 402, 22 Sup. Ct. 124, 46 L. Ed. 253, the bond sued on insured a bank against such pecuniary loss as it might sustain by reason of the fraudulent acts of its teller, and contained a provision that it would notify the insuring company on "becoming aware" of the teller "being engaged in speculation or gambling." The trial judge, in deciding the case, said in his opinion:

"The language of the bond is that the employer shall report 'on his becoming aware of the employé being engaged in speculation.' Without now stopping to consider at length the meaning of the terms here used, I am of opinion that, in the absence of fraud or bad faith, the failure to disclose the result of the inquiry made in this instance did not invalidate the bond as to the surety. Certainly speculation in a reasonable and substantial sense is meant, such in length of time or magnitude as would make it serious. This, when brought to the attention of the bank officials, was a past event, and apparently in itself unimportant. The bank was under no duty by the contract or independently of it to actively institute or prosecute inquiries about Schardt, or to run down loose rumors or anonymous letters."

The Circuit Court of Appeals, to which the case was first taken, said:

"There is not the least evidence of any bad faith on the part of any of these officers of the bank, including Sykes, the old cashier, in not making a disclosure of what was known, but only of bad judgment in not being more considerably affected by their information."

The Supreme Court, in considering these expressions of opinion, said (183 U. S. 421, 22 Sup. Ct. 132, 46 L. Ed. 253):

"The quotations show that the Circuit Court of Appeals and the Circuit Court concurred in the opinion that if the president and directors had such confidence in Schardt that they did not feel called upon to make any investigation in view of the information that they had received, or to notify the company of that information, and were not guilty of intentional bad faith, then the bank could not be held to have violated the stipulations of the bond on its part. As will have been seen, we are unable to accept this conclusion. The company's defense did not rest on the duty of diligence growing out of the relation of the parties, but on the breach of one of the stipulations entered into between them. The question was not merely whether the conduct of the bank was contrary to the nature of the contract, but whether it was not contrary to its terms. Engagement in speculation or gambling was what the company sought to guard against, because experience had ad-

monished it of the probability that speculation or gambling would lead to acts involving loss for which it would be responsible. Bad faith in the view of the courts below would not exist if the bank had such confidence in Schardt's integrity that it accepted his bare statement that he was not speculating as overcoming the weight of his admission that he had been. How anything but such a denial could be expected it is not easy to see, nor how careful and prudent men could have been justified in omitting independent inquiry. * * * We think it was the duty of this bank to have made prompt investigation, or at all events to have notified the company at once of the information that it had, and we decline to hold that the bank's misplaced confidence in Schardt affords sufficient ground for enforcing the liability of the Surety Company on the theory of good faith. Our conclusion is that the failure of the bank in the particulars adverted to defeats a recovery on the teller's bond for defalcation after information of Schardt being engaged in speculation was received."

The gist of the decision of the Supreme Court in that case is that by the bond there in suit the bank was required to give the Surety Company notice on becoming aware that the teller was engaged in speculation or gambling, because such was the contract of the parties. The bond here in suit expressly made the required notice a condition precedent to any recovery upon it, and expressly required that upon the discovery of any fraud or culpable negligence on Brown's part, and that a loss had thereby been sustained, *or of facts indicating* that a loss would *probably* thereby be sustained, the employer should *immediately* give the insurer notice, and that failure to give such *immediate* notice should relieve the Surety Company of all liability under the policy on account of the employé.

As has been already pointed out, there was and is in this case no conflict in the evidence concerning the facts showing that the Railway Company knew at least as early as November 1st that Brown, if not guilty of fraud, was at least guilty of "culpable negligence" in the handling of its funds; for no other conclusion could be drawn by any reasonable man from the facts stated by the officers of the Railway Company having charge of the matters in question. The law undoubtedly is that the requirement of "immediate" notice in policies of insurance means a reasonable notice in view of all of the circumstances of the case, and that where the facts relied upon to excuse a failure sooner to give a notice of loss are disputed, or the inference to be drawn therefrom is uncertain, the question as to whether the notice is "immediate" under the circumstances of the case, is for the jury. But when it is borne in mind that the obvious purpose of the notice in question was to enable the Surety Company to take steps for its protection, and that the Railway Company delayed from at least November 1st to November 20th before giving the insuring company any notice whatever of Brown's acts, or of any fact indicating any loss or probable loss by reason of them, while it was, during all of the intervening time, as shown by the telegrams referred to and by the uncontradicted testimony concerning the sending of one of the attorneys from Mr. Cutcheon's office to San Francisco, preparing for litigation against the Trust Company, its officers and stockholders, *based upon fraud* in connection with the deposit by Brown of $100,000 of its money on October 26th in that bank—when, I say, all of these facts

are considered, it must, in my opinion, be held as a matter of law that the notice given by the Railway Company to this Surety Company was not the "immediate" notice required by the contract of the parties. And I think the following authorities, and the numerous cases there referred to, sustain this conclusion: National Surety Co. v. Long, 125 Fed. 887, 60 C. C. A. 623; Gamble-Robinson Co. v. Mass. Bonding & Ins. Co., 113 Minn. 38, 129 N. W. 131; Parker v. Insurance Co., 179 Mass. 528, 61 N. E. 215; Travelers' Insurance Co. v. Myers, 62 Ohio St. 529, 57 N. E. 458, 49 L. R. A. 760; Foster v. Fidelity & Casualty Co. of N. Y., 99 Wis. 447, 75 N. W. 69, 40 L. R. A. 833.

It is a sufficient answer to the suggestion that the Surety Company waived the objection that the notice was not given in time, by failing to object to it when given, to say, first, that a waiver, to be effective, must be made with full knowledge of the facts; and, second, that the complaint contains no allegation of waiver.

In my opinion, the judgment should be reversed, and the cause remanded for a new trial.